**COMPANION ASSURANCE COMPANY and RICARDO FOURNIER,**
**Appellants/Defendants**
**v.**
**SHAWN SMITH and KRISTIN COATES, Appellees/Plaintiffs**

S. Ct. Civil No. 2016-0056
Supreme Court of the Virgin Islands
May 23, 2017

ANDREW C. SIMPSON, ESQ., Andrew C. Simpson, P.C., St. Croix, USVI, *Attorney for Appellants.*

LEE J. ROHN, ESQ., RHEA LAWRENCE, ESQ., Law Offices of Lee J. Rohn and Associates, LLC, St. Croix, USVI, *Attorneys for Appellees.*

HODGE, *Chief Justice*; CABRET, *Associate Justice*; and SWAN, *Associate Justice.*

## OPINION OF THE COURT

(May 23, 2017)

HODGE, *Chief Justice.* Companion Assurance Company ("Companion") and Ricardo Fournier appeal from a January 11, 2016 judgment and a September 1, 2016 order following a jury verdict in favor of Shawn Smith and Kristin Coates finding Fournier liable for damages arising out of defamation and Companion liable for damages arising out of breach of contract. For the reasons that follow, we dismiss the appeal as untimely.

## I. BACKGROUND

In September 2012, Coates and Smith sued Companion and Fournier alleging that Companion had breached the duty of good faith and fair dealing in carrying out the terms of Coates's insurance contract, and had defamed both Coates and her cousin, Smith, in the process of adjusting her claim. These allegations arose following the theft of Coates's vehicle that she purchased for $16,000 and had contracted with Companion to insure the vehicle at an actual cash value of $12,875.

In late February 2012, Coates reported to the Virgin Islands Police Department that she lost the keys to her vehicle while it was parked in the parking lot of a St. Croix shopping mall. Several days later, on March 4, 2012, Coates's vehicle was stolen while parked outside of a nightclub. The following day, her vehicle was found on the side of the road away from the nightclub, but by that time, the vehicle had been carefully stripped down for parts, leaving only a shell of the former vehicle. At the direction of the Virgin Islands Police Department, the remnants of the vehicle were removed from this location and were ultimately towed to Smith's home at Coates's request. Thereafter, Coates obtained an estimate of $36,251 to repair the vehicle she had purchased for $16,000. Coates expressed that she wanted to keep the salvaged vehicle, so that she could rebuild the car on her own time. Coates testified that when reporting her claim, Rafael Miro, an agent of Companion, informed her that she could keep the vehicle as salvage. That initial conversation, however, was countermanded when Fournier, Companion's claims manager, informed her days later that she would not be permitted to keep the salvage.

After filing the appropriate paperwork required to process the claim, Coates and Smith met with Miro to walk with him through the inspection of the vehicle. They indicated that Miro was sarcastic as if he wanted to accuse Coates of staging the theft of her own vehicle, due to how "neatly" the thieves had stripped the parts. (J.A. 222.) Testimony of a police investigator subsequently indicated that there was nothing unusual about how the car was stripped, and there was no evidence presented that suggested that Coates was somehow involved in the theft of her vehicle.

Following the inspection, Coates complained to the Banking and Insurance Division of the Virgin Islands Office of the Lieutenant Governor, contending that Fournier refused to sell her the salvaged vehicle and that Fournier discriminated against her. Fournier responded to the complaint by informing the Lieutenant Governor's representative that it was Companion's "policy" to dispose of vehicles that had been "surgical[ly]" dismantled where there was "no forced tampering [of] the ignition." (J.A. 179.) The Lieutenant Governor's representative testified that in her opinion Fournier's response indicated that he believed "some[one] who knew the car had something to do with" its theft. (J.A. 179.)

Coates eventually signed a document authorizing the insurance company to pick up the salvaged vehicle. Days later, the Lieutenant

564

Governor's representative emailed Fournier asking that he explain and justify the $12,875 limit on the vehicle considering that Coates purchased it for $16,000 in Florida and had shipped it to the Virgin Islands. She believed the policy limit was too low, and that it did not include the shipping and tax as she contended is required in the Virgin Islands. Fournier responded that he was not going to adjust the policy limit. He produced no evidence supporting his depreciation calculation at trial, and admitted that the amount did not include the shipping and tax costs. Nevertheless, Coates agreed to accept payment of $10,951.21 in full satisfaction of her claim.

Following notice of the intended payment, however, a dispute again arose as to whether Coates would be permitted to keep the salvaged vehicle. Companion contended that because it had a practice of dealing with previously stolen salvaged vehicles, it would not allow Coates's vehicle to be kept, to discourage future thefts. Companion's owner, however, later explained that there existed no written policies that dealt with salvaged and stripped vehicles.

Because of the purported policy to not allow retention of the salvage, Fournier hired Jose Medina, a tow truck driver and auto-body technician, to retrieve the car from Smith's yard in April, 2012. Fournier and Medina were friends who knew each other for several years prior to the circumstances surrounding this case, and had been engaged in a side partnership wherein they would repair and resell salvaged vehicles for profit. On at least one occasion before attempting to retrieve Coates's vehicle, Fournier informed Medina that he believed that "local people" are a "bunch of" "very lazy," "low life[s]" who only "want to . . . sell drugs or smoke drugs." (J.A. 262.) Medina testified that Fournier informed him he was "[one] hundred percent sure" that the "rasta man," Smith, was involved in the theft. (J.A. 264.) Medina informed Smith of Fournier's allegations.

When Medina, Miro, and another man named Ismael Elias, arrived at Smith's home on April 4, 2012 to retrieve the vehicle, a disagreement ensued with Smith who insisted that the vehicle could not be removed until Coates arrived because he knew that she wanted to buy it. Fournier was not present, but had given the instructions to have the car towed. When Coates arrived, the disagreement continued because she asserted that she had the right to keep the vehicle for salvage. Angered, Miro remarked "[Fournier] was right. I believe" Smith "stole . . . the car." (J.A.

100.) Smith, seemingly upset, asked Miro if he was "calling [him] a thief," to which Miro responded "those weren't my words. Those were [Fournier's] words." (J.A. 100.) Miro proceeded to telephone Fournier from Smith's property to explain the situation. But, Smith explained that when Miro returned from the phone call, "he was screaming at [Coates] and telling her she's not keeping the car . . . . you niggers think we're stupid. We know you stole the car and have the parts and want to put them back on." (J.A. 230.) Miro made this statement in front of Coates, Smith, Smith's mother, Medina, and Elias.

Coates was angered and embarrassed by the statements, and after some exchanged words between Smith and Miro, Coates told them to take the vehicle. She claimed that after the incident, members of the community, on several different occasions, asked if she had something to do with her car being stolen, and suggested that she was a thief. Smith stated that he suffered migraines as a result, and explained that Fournier had tarnished his name throughout the community, accusing him of being a thief to at least three different people. Several witnesses testified to the same effect. Smith explained that after the rumors started, he could not find work.

Still, by April 4, 2012 when the vehicle was retrieved, Companion had not tendered the settlement check. Although the check had been prepared on March 28, 2012, Fournier wrote a note on March 30, 2012 instructing staff not to present the check until the salvaged vehicle was in their possession. Leaving Coates without a vehicle or a check for the agreed to replacement value for almost an additional month, Coates finally received payment on April 26, 2012.

Sometime after the lawsuit was filed in September 2012, Fournier asked Medina and Elias to sign documents saying that Miro acted professionally and never used the word "nigger." After Medina refused, Fournier "retaliated by not giving [him] anymore work." (J.A. 288.) At trial, the Lieutenant Governor's representative testified that it is not unusual for insured parties to keep the salvaged vehicle when it gets stolen and recovered. She also testified that it would be improper for insurance companies, if they decided to sell the salvaged vehicle, to refuse an insured party's request to buy the salvaged vehicle back, explaining that the insured generally has the right of first refusal to buy the salvaged vehicle.

Following a jury trial, on January 11, 2016 the Superior Court entered judgment in favor of: (1) Smith against Companion on his claim for

defamation in the amount of $7,500 in compensatory damages and $75,000 in punitive damages; (2) Smith and against Fournier on his claim for defamation in the amount of $2,500 in compensatory damages and $50,000 in punitive damages; and (3) Coates and against Companion on her claim for breach of the duty of good faith and fair dealing in the amount of $3,000 in compensatory damages and $30,000 in punitive damages. On February 8, 2016, Companion and Fournier filed timely motions for new trial and judgment as a matter of law. On May 31, 2016, the Superior Court entered an order setting oral argument on post-trial motions for August 30, 2016. Following the August 30, 2016 Superior Court hearing, the Superior Court entered an order denying the post-trial motions on September 1, 2016. Companion and Fournier filed a notice of appeal with this Court on October 3, 2016.[1]

## II. DISCUSSION

This Court has appellate jurisdiction over "all appeals from the decisions of the courts of the Virgin Islands established by local law[.]" 48 U.S.C. § 1613a(d); *see also* 4 V.I.C. § 32(a) (granting this Court jurisdiction over "all appeals arising from final judgments, final decrees or final orders of the Superior Court").

Coates and Smith assert that this Court should dismiss this appeal because Companion and Fournier waited until October 3, 2016, almost nine months after the entry of the Superior Court's January 11, 2016 judgment, to file a notice of appeal. Specifically, they point to two Virgin Islands Rules of Appellate Procedure[2] to support their argument for dismissal. First, Rule 5(a)(1) provides that the notice of appeal in a civil

---

[1] Were this Court to accept that this appeal was properly taken from the Superior Court's September 1, 2016, order denying the post-trial motions, Virgin Islands Rule of Appellate Procedure 5(a)(1) would ordinarily require Companion and Fournier to have filed their notice of appeal within thirty days after the entry of that judgment, i.e., on October 1, 2016. However, because October 1, 2016, was a Saturday, the deadline for Companion to file its notice of appeal would automatically be extended to Monday, October 3, 2016. *Coastal Air Transp. v. Royer*, 64 V.I. 645, 650 n.4 (V.I. 2016); V.I. R. App. P. 16(b).

[2] On March 31, 2017, Promulgation Order 2017-0004 changed the name of rules 1 through 41 of the former "Virgin Islands Supreme Court Rules" to the current "Virgin Islands Rules of Appellate Procedure." Although several rules were also changed substantively as a result of that order, no such changes have been made to the rules applicable in this case. Accordingly, we rely on our former opinions addressing the former Supreme Court Rules in analyzing the operation of the Rules of Appellate Procedure applicable here.

case must be filed within 30 days after entry of judgment. Second, Rule 5(a)(4) provides that in a case where a:

> party timely files in the Superior Court a motion for judgment as matter of law . . . [or] for a new trial . . . the time for filing the notice of appeal for all parties is extended until 30 days after the entry of an order disposing of the last such motion; provided, however, that the failure to dispose of any motion by order entered upon the record within 120 days after the date of the motion was filed shall constitute a denial of the motion for purposes of appeal.

On February 8, 2016, Companion and Fournier filed motions for new trial and judgment as a matter of law. Coates and Smith assert that this Court should nevertheless not review the January 11, 2016 ruling under the plain language of Rule 5(a)(4), because as of July 7, 2016 — the date that was 150 days after February 8, 2016 — the Superior Court had not yet ruled on the post-trial motions and no notice of appeal was filed.

■ Companion and Fournier counter by arguing that it would be improper for this Court to dismiss this appeal as untimely, because the filing of a motion for new trial rendered the Superior Court's January 11, 2016 judgment non-final, and thus not subject to appellate review under title 4, section 32(a) of the Virgin Islands Code. They therefore assert that the commencement of the period within which to file an appeal was tolled until the Superior Court's ruling on the motion for new trial. Additionally, they assert that Rule of Appellate Procedure 5(a)(4) runs afoul of title 4, section 33(b) governing interlocutory appeals, and that this Court did not have the grant of authority to promulgate Rule 5(a)(4). In essence, they argue that by permitting review of an appeal where post-trial motions still remain, this Court acted to create another avenue for an interlocutory appeal that was not permitted by statute. Although Companion and Fournier couch their argument in language invoking this Court's jurisprudence concerning interlocutory orders and appeals, we note that a motion for new trial, and a renewed motion for judgment as a matter of law following a Superior Court judgment disposing of the merits, seek relief from a final judgment of the Superior Court that "end[ed] the litigation on the merits and le[ft] nothing to do but execute the judgment," *Beachside Assocs., LLC v. V.I. Water & Power Auth.*, 62 V.I. 723, 726 (V.I. 2015) (citation omitted), constituting a final order from which the parties possessed the right to appeal, 4 V.I.C. § 32(a), and thus is not

interlocutory. *See also* 1 V.I.C. § 42 ("Technical words and phrases, and such others as may have acquired a peculiar and appropriate meaning in the law, shall be construed and understood according to their peculiar and appropriate meaning."); BLACK'S LAW DICTIONARY 889 (9th ed. 2009) (defining interlocutory as "(Of an order, judgment, appeal, etc.) interim or temporary; not constituting a final resolution of the whole controversy").

■ ■ "[T]he Revised Organic Act, by its own terms, provides that '[t]he rules governing the practice and procedure of the courts established by local law . . . shall be governed *by local law or the rules promulgated by those courts.*' " *Gerace v. Bentley*, 65 V.I. 289, 302 (V.I. 2016) (quoting 48 U.S.C § 1611(c)) (emphasis and alterations in original); *see also* 4 V.I.C. § 34(a) (granting this Court the authority to "promulgate or amend general rules, or where it considers it best for the advancement of justice, . . . provide for the conduct of the business of the Court, and regulate the practice and procedure governing causes and proceedings in the Court"). "It is [our] inherent power" as a "court of last resort to develop procedural rules of general applicability for the entire judicial branch," *Gerace*, 65 V.I. at 304, a power that was exercised with the adoption of the former Virgin Islands Supreme Court Rules, and again with Promulgation Order 2017-0004 amending them *inter alia* to become the Virgin Islands Rules of Appellate Procedure. Because of such authority, rules of this Court have the force of law, and are to be interpreted and construed in the same manner as statutes. *E.g., Vanterpool v. Gov't of the V.I.*, 63 V.I. 563, 576 (V.I. 2015) (noting that parties were not permitted to stipulate to the law, in agreeing to apply rules of a separate court); *In re Petition for Disbarment of Plaskett*, 56 V.I. 441, 447 (V.I. 2012) (citing *Corraspe v. People*, 53 V.I. 470, 480 (V.I. 2010) (noting that the canons of statutory construction equally apply when interpreting court rules)). As we have determined, Rule 5 of the Virgin Islands Rules of Appellate Procedure is, like its predecessor, a non-jurisdictional claims-processing rule that does not foreclose this Court from reviewing an otherwise untimely appeal in the exercise of our discretion, and it is clearly within our authority to "promulgate" rules for the advancement of justice. *Peters v. People*, 60 V.I. 479, 484 (V.I. 2014).

■ This Court adopted Rule 5(a)(4) to ensure, as numerous other courts of last resort have in adopting similar court rules, that court business is expedited and to prevent cases from lying dormant in the trial court due to failures to rule on post-trial motions that stifle the prompt

administration of justice. *See, e.g., Paxton Res., L.L.C. v. Brannaman*, 2004 WY 93, 95 P.3d 796, 800 (Wyo. 2004) (reasoning that its "deemed denied" for purposes of appeal provision was necessary for "expediting court business and preventing trial judges from keeping motions for new trial under advisement for an unreasonable length of time" (quoting *Bd. of Com'rs of Natrona Cnty. v. Casper Nat'l Bank*, 55 Wyo. 144, 96 P.2d 564, 566 (1939))). Although the timing provisions for filing with this Court in Rule 5 are non-jurisdictional, Rule 5(a)(4)'s 120-day provision denying the motion for purposes of appeal divested the Superior Court of jurisdiction to rule on the post-trial motion once the 120 days expired. *Accord Ex parte Caterpillar Inc.*, 708 So. 2d 142, 143 (Ala. 1997); *Freiberg v. City of Mission Viejo*, 33 Cal. App. 4th 1484, 39 Cal. Rptr. 2d 802, 805 (1995); *Barker Phillips, Inc. v. Caviness*, 603 S.W.2d 715, 715 (Mo. Ct. App. 1980); *Commonwealth v. Santone*, 2000 PA Super 220, 757 A.2d 963, 966 (Pa. Super. Ct. 2000). As a result, the Superior Court's September 1, 2016 order denying the post-trial motions was a nullity because the court did not have jurisdiction to rule after the 120-day tolling period had passed.

■ Here, the Superior Court entered its final judgment on the jury verdict on January 11, 2016, and on February 8, 2016, Companion and Fournier filed their motions for new trial and judgment as a matter of law. Pursuant to Rule 5(a)(4), the commencement of the time to file their notice of appeal was tolled to the date of a decision on the motions or 120 days, which ever period was shorter. Thus, the time to file the notice of appeal was tolled, until June 7, 2016, if the Superior Court failed to rule on those motions. Thereafter, Companion and Fournier had an additional 30 days (until July 7, 2016) to file their notice of appeal, V.I. R. APP. P. 5(a)(4), or an additional 30 days (until August 8, 2016)[3] beyond that upon a showing of excusable neglect. V.I. R. APP. P. 5(a)(8), 16(b). However, Companion and Fournier waited until October 3, 2016, 118 days after the date their post-trial motions were deemed denied for purposes of appeal, and 56 days beyond the period by which a showing of excusable neglect for good cause could have extended the deadline in accordance with Rule 5(a)(8). Although Companion and Fournier contend that they were

---

[3] Although August 6, 2016 is thirty days after July 7, 2016, because it is a Saturday, Companion and Fournier would have had until August 8, 2016 to file their notice of appeal had they demonstrated excusable neglect. V.I. R. APP. P. 5(a)(8), 16(b).

awaiting the Superior Court ruling, we decline to permit such blatant disregard of this Court's rules because "relaxing the requirements . . . under normal circumstances would severely undermine and weaken the rule's purpose, and diminish society's legitimate interest in the finality of a judgment that has been perfected by the expiration of the time allowed for direct review." *Peters*, 60 V.I. at 484 (citations, internal quotation marks, and brackets omitted); *see Paxton*, 95 P.3d at 801-02 (interpreting a similar court rule and dismissing an appeal for failure to adhere to the court's rule requiring parties to file a timely notice of appeal in light of its "deemed denied" provision); *see also Bombardier Capital, Inc. v. Williams*, 850 So. 2d 363, 364 (Ala. Civ. App. 2002) (dismissing an appeal filed from a trial court order that denied post-trial relief but post-dated the jurisdiction's deemed denied provision, as untimely); *Santone*, 757 A.2d at 966 (determining in a criminal action that a motion to "modify sentence[,] was denied by operation of law when the trial court failed to issue a decision within the 120-day period set forth" by court rules, thus "[t]he trial court no longer had jurisdiction to issue" an order filed after that date); *Freiberg*, 39 Cal. Rptr. 2d at 805-06; *Caviness*, 603 S.W.2d at 715; *Minor v. Leisure Lodge, Inc.*, 154 Ore. App. 301, 961 P.2d 915, 916-17 (1998). We accordingly dismiss this appeal as untimely.

## III. CONCLUSION

Because Companion and Fournier have failed to give any substantial reason why this Court should relax the requirements of former Supreme Court Rule 5(a)(4), now embodied in Rule 5(a)(4) of the Virgin Islands Rules of Appellate Procedure, we dismiss this appeal as untimely.