**ROBERT J. CHAPUT, Petitioner**
**v.**
**DONALD C. SCAFIDI and PATRICIA M. SCAFIDI, Respondents**

Case No. SX-10-SM-123
Superior Court of the Virgin Islands
Division of St. Croix
June 14, 2017

162

ROBERT J. CHAPUT, Frederiksted, USVI, *Petitioner Pro se.*

DONALD AND PATRICIA SCAFIDI, Christiansted,[1] USVI, *Respondents Pro se.*

MOLLOY, *Judge*

## MEMORANDUM OPINION

(June 14, 2017)

**THIS MATTER** is in the Appellate Division on review from the Magistrate Division. Robert J. Chaput ("Chaput") sued Donald ("Don") and Patricia ("Patti") Scafidi[2] for money Chaput claimed that he loaned them and for the value of his late wife's gun, which Chaput claimed Patti stole. After requesting and receiving a number of continuances, the Scafidis failed to appear nearly two years later when the case was called for trial. Rather than enter their default, the Magistrate Court instead went forward with the bench trial, but found that Chaput failed to prove his claims and dismissed his complaint with prejudice. Chaput petitioned for review and argues on appeal that his evidence was sufficient, that the court erred because it considered matters not in evidence, and also erred by not letting him clarify any inconsistencies in the evidence. Subsequently, while this review was pending in the Appellate Division, Chaput "filed a voluntary Chapter 13 bankruptcy petition." *Chaput v. Cianci,* 64 V.I. 682, 686 (V.I. 2016).

---

[1] After the complaint was filed, the Respondents relocated to Mississippi. However, the record does not reflect their current address.

[2] Because other members of the Scafidi family participated in this matter, the opinion refers to the Scafidis by their first names to avoid confusion.

For the reasons stated below, the Court concludes that it can hear this review, notwithstanding the bankruptcy stay because the automatic stay does not apply to cases commenced by the debtor or to appeals taken by the debtor from such cases. Since Chaput filed the small claims case and also filed for review of the dismissal of that case, the automatic stay does not apply here and this review can go forward. After reviewing the evidence and considering the law, the Court concludes that the Magistrate Court's decision must be affirmed in part and reversed in part. The court reached the right result regarding the stolen gun claim and three of the debt claims, but the court erred on one of the debt claims. The Scafidis defaulted and by defaulting admitted the allegations against them. Chaput's only viable claim was for a sum certain. So, he did not have to prove that claim. Although the court may not have committed error by proceeding with a hearing or trial, the court did err in holding that Chaput had to corroborate his own evidence and further by relying on irrelevant evidence to rule against Chaput. The dismissal order must be vacated and this matter remanded for entry of a partial judgment in favor of Chaput.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Chaput and his late wife, Evelyn, met Don and Patti Scafidi years ago at an art show. Don is "an artist, a very good artist" (Hr'g Tr. 5:25. Nov. 2, 2011). Evelyn was an artist too. The Chaputs and the Scafidis became "good friends." *Id.* at 6:3-4. in fact, Chaput "taught the whole family how to play tennis." *Id.* at 15:22-23. At some point in 2009, the Scafidis — or perhaps just Patti — approached Chaput about borrowing money. Chaput had loaned the Scafidis "money [once] before, a sizeable sum . . . and they paid it. So [he] felt reasonably assured" that they would repay another loan. *Id.* at 5:20-22. They did not, at least according to Chaput, so he filed a complaint against them in the Small Claims Division of the Superior Court of the Virgin Islands.

Chaput's complaint, filed February 11, 2010, named "Donald & Patti Scafidi" as the defendants. (Compl. 1.) The complaint asserted claims for debt and for a stolen gun. In support, Chaput attached the following documents: a February 4, 2010 message from USAA regarding a June 1, 2009 transfer of $6,000 from his account to the Scafidis; copies of cancelled checks from Chaput's Bank of St. Croix checking account with three of them written to Patti; and emails between Patti and Chaput's stepson, John A. Cianci, regarding the Scafidis failure to vacate an

apartment at the inn at Pelican Heights in Estate St. John.[3] In the aggregate, Chaput's complaint demanded judgment for $10,000, the statutory limit of the jurisdiction of the Small Claims Division. *See* 4 V.I.C. § 112(a).

The Clerk's Office processed Chaput's complaint, assigned it to a Superior Court magistrate, calendared the case for March 16, 2010, and then issued notice to Chaput of the date. Summons was issued to Don, but not to Patti, even though the complaint named them both as defendants. Don was served on February 11, 2010. Proof of service was never filed for Patti. Five days after he was served, Don filed a motion to request a continuance. Patti was "in the United States mainland receiving medical treatment" and he was "scheduled to travel . . . to accompany his ailing wife." (Def.'s Mot. for Continuance 1, filed Feb. 16, 2010.) This is the only document between the parties that reflects service by any of them on each other. By order entered February 26, 2010, the Magistrate Court granted Don's motion and continued the trial to May 25, 2010. Another year and a half would pass before the trial went forward.

Four days before the next trial date, Don filed another motion, this time by fax, to request another continuance, until "the month of September," because Patti's health prevented him from returning to St. Croix. (Def.'s Mot. 1, filed May 21, 2010.) Don remarked that Chaput's "lawsuit is frivolous, but we feel we must answer it and want to do so." *Id.* He had asked Patti's doctor if she could travel to St. Croix for the trial "and got an emphatic NO." *Id.* Don concluded by asking the court to "please allow [him] to defend this claim at a later date." *Id.*

The court did not rule on Don's motion before the scheduled trial date. So, Chaput appeared on March 16, 2010 and was allowed to testify under oath about a promissory note he and Patti allegedly signed, a copy of which was submitted and marked as Plaintiff's Exhibit 1. The Magistrate Court advised Chaput, however, that he would have to repeat his testimony for the Scafidis because they could not appear. The court then granted Don's second motion and continued trial to September 14, 2010. The court also told Chaput that trial would go forward on that date, even if the Scafidis did not appear. That did not happen.

---

[3] Another document, referenced as "exhibit 6" in the complaint, was either inadvertently omitted or is no longer part of the record.

Instead, on August 31, 2010, Patti now sent a letter to the Clerk's Office and to the Magistrate Court, also by fax, stating that Don had suffered a stroke and was in the hospital. "We of course have no option but to ask for another continuance," she wrote. (Def's Mot. 1, filed Aug. 31, 2010.) "I myself was never served," she said, "but according to my husband I have to come there too in order to defend myself." *Id.* "Why in the world he would be sued as well is beyond me," she remarked. "He never received a penny from Mr. Chaput." *Id.* Patti concluded, saying "[a]s soon as my husband is home, I am going to send my version of what happened." *Id.* That too never happened.

Chaput appeared on September 14, 2010 and was told about Don's condition and his inability to travel. The court granted the Scafidis a third continuance and rescheduled the trial for January 12, 2011 to allow Don additional time to recover. The Clerk's Office notified Patti by email on December 9, 2010 of the new trial date. The next day, the Scafidis' daughter, April Scafidi ("April"), replied, but from her mother's email account, and told the Supervisor of the Civil/Small Claims Division[4] ("Supervisor") that her father still could not travel due to his health. She said they were "trying to put together an answer to Mr. Chaput's claims, make you all aware of our side of this story. . . . More will come in a formal counter-complaint (We will keep it under the maximum). One thing is for sure; My father never borrowed money from Mr. Chaput." (Email from Patricia Scafidi (Dec. 10, 2012).) The counterclaim never came.

A month later, on January 6, 2011, less than a week before the fourth trial date, Patti emailed again and told the Supervisor that Don had to undergo surgery the next day and could not travel. She attached a photograph of Don's surgical incision as proof. After April had contacted the Supervisor, but before Patti did, the Magistrate Court, by order dated December 27, 2010, granted April's request and "allow[ed] one last continuance" and further "encouraged" the Scafidis "to either appear or send a representative so that this matter may be heard." (Order 1, entered Jan. 10, 2011.) Due to the Christmas holidays, the order was not entered until January 10, 2011. So, Patti did not know that the court had already rescheduled the trial for a fifth time, to March 9, 2011.

---

[4] The Civil Division and the Small Claims Division, by statute, are separate divisions. *See* 4 V.I.C. § 79(a). Functionally, however, they are the same division, at least insofar as staffing is concerned.

The Scafidis did try to heed the Magistrate Court's suggestion because their son, Lee M. Scafidi ("Max"), appeared in court on March 9, 2011. The record contains the following letter, dated March 5, 2011, that Don sent to Max, which states:

> Dear Max:
>
> Bob Chaput is attempting to obtain a judgment in court against me for $6500 he allegedly loaned to me. By this letter I am appointing you to appear in court on my behalf. I would more than like to be there to defend his frivolous suit but cannot afford the airfare and other expenses it would entail.
>
> My defense is simple; I have never borrowed any money from Bob Chaput whatsoever. I can swear to this under oath. I have never signed any promissory note or debit note to him for any amount and I have never promised him any of my paintings except the two I did give him; one of his dear deceased wife, Evelyn and another of a cruise ship in Frederiksted.
>
> Your mother worked for him for many months. I do not have knowledge of their financial arrangement if any.
>
> Sincerely,
> Dad.

(Letter from Don Scafidi to Max Scafidi 1, dated Mar. 5, 2011, attached to Email from Def. Patti Scafidi, docketed June 14, 2011.) Don's letter to Max was not served on Chaput, however. Whether Max was authorized to appear on behalf of his mother is unclear. Even though Max did appear at the March 9, 2011 hearing, the record of proceedings indicates that the court continued the case once more to June 15, 2011, to allow the Scafidis more time to appear.

Two days before the June 15, 2011 date, Patti emailed a court clerk and asked for another continuance. She acknowledged that Max had appeared "bearing a letter from . . . Don . . . authorizing him to testify on his behalf," but was "sent away . . . because Mr. Chaput would not let him appear." (June 14, 2011 Email 1.) Patti stated that she and Don "were not advised . . . by the court" that Max was "expected in court on June 9th [sic]." *Id.* "Evidently my son was" aware, she remarked, "but [he] cannot be there in June." *Id.*

> We live on the Gulf Coast. We are in hurricane season. My husband has to be seen weekly at the Veteran's hospital and is due for several sur-

geries this summer. I am told that my son will be in St. Croix again on his own arbitration matter in July or August. This is noted in my husband's attached signed letter of June 9th. . . . I pray that [the magistrate j]udge . . . would not put us in default over our inability to travel.

*Id.* Chaput appeared on June 15, 2011. No one appeared on behalf of the Scafidis. From the bench the Magistrate Court granted Patti's request and continued the trial date to August 24, 2011.

Two days before the August 24, 2011 date, Chaput now requested a continuance. His "daughter, Sherry Young will testify." (Pl's Mot. 1, filed Aug. 22, 2011.) But Sherry was undergoing surgery and could not appear. Chaput too wanted to have his stepson, John, testify. So, he asked that the trial date be rescheduled from "24 August 2011 to a time at least 2 months from this date." *Id.* The court granted his motion the next day and rescheduled trial to November 2, 2011. The Clerk's Office entered the August 23, 2011 order on August 29, 2011. But, because of the delay in entering the order, the Scafidis were not notified in time that the trial was continued.

Don sent a letter to a court clerk two months later, complaining that he had asked a friend, Donna Ealy, to appear for him on August 24, 2011. Ealy had flown from Texas to St. Croix because a court clerk had informed the Scafidis that the Magistrate Court "had issued a FINAL date in August which could not be continued." (Def. Don Scafidi's Letter 1, filed Oct. 21, 2011.) "Mrs. Ealy sat in the courtroom until after 12:00 p.m.," Don wrote, "only to find out that Mr. Chaput had requested a continuance (by telephone) just the day before. He can afford such short notice," Don said, because "he lives in [Estate] St. George." *Id.* Don further explained that Ealy brought with her an affidavit sworn by him in which he "disput[ed] the claim and false evidence made against" him by Chaput. *Id.* But Ealy did not leave the affidavit with the court. So, Don sent a copy with his October 21, 2011 Letter and explained that he had "no one to act in [his] stead on November 2nd." *Id.* Don "beseeched" the court "not to let this case end in default. I very much want to answer this claim myself," he wrote, "or at least have someone who was 'there' to represent me. If you will order a new date, I would pray that it is after the first of the year." *Id.*

The record does not show whether Don served Chaput with a copy of the affidavit. The original affidavit was eventually filed on October 31,

2011. In it, Don swore that he "never borrowed any money from Robert J. Chaput whatsoever" and "never endorsed a check, signed any promissory note or debit note to Robert J. Chaput whatsoever." (Affid. of Donald Scafidi 1, filed Oct. 28, 2011.) Don disputed the USAA message Chaput had attached to his complaint, stating that the note itself said that the transfer was "made to a checking account of Donald OR Patricia Scafidi." *Id.* Chaput, however, "indicated" in "his handwriting" on the copy attached to the complaint "that it was a wire transfer to Donald AND Patricia Scafidi. No such wire transfer exists," Don stated. *Id.* Don acknowledged the checks that Chaput wrote to "Patty [sic] Scafidi for various amounts," but noted that "[i]n each instance he writes on the check that it is for some service rendered." *Id.* Don concluded, stating that he "did not then and still have no knowledge of financial arrangements between Robert J. Chaput and Patty Scafidi." *Id.*

The Magistrate Court held a bench trial on November 2, 2011. Chaput, Sherry Young, and John Cianci testified. Chaput also presented documentation as evidence.[5] The Scafidis did not appear. The Magistrate Court proceeded without them. However, the court clerk did not enter their default. According to the testimony and evidence, Chaput loaned the Scafidis $6,000 on "June 1, 2009." (Hr'g Tr. 5:8, Nov. 2, 2011.) The money was wired from Chaput's account with USAA to "an account in the names of Donald C. or Patricia M. Scafidi." (Pl.'s Ex. 4.) Patti was working on St. Croix at the time as a realtor with Farchette & Hanley. (Hr'g Tr. 11:12, 15:5-8.) She had approached Chaput about buying a piece of property, the Inn at Pelican Heights in Estate St. John. The property was valued at $400,000. So, Patti assured him that, if she was unable to repay the loan, she could repay it from the commission she would receive from the sale. The closing on the property occurred on September 4, 2009. (*See* Compl. 1.) The loan was not repaid.

Chaput testified that he and Patti reduced their agreement to writing in a promissory note that Patti typed up. They signed the note sometime later, but after he had already given them the money. Four of Don's paintings were used as collateral: *Galleon, Anchor Watch, Pride of Baltimore,* and *Sunset Silhouette.* Partial payments were allowed and the

---

[5] Documents marked at the hearing were not formally moved into evidence. However, they were considered during the hearing, so the Court proceeds as if Chaput's documents were admitted into evidence.

security interest in the paintings would be removed accordingly. The entire $6,000 loan had to be repaid by a date certain and if not, the paintings became Chaput's property. Patti signed the note — if she signed it, that is — on behalf of Don. Patti had power of attorney for him at the time. (*See* Chaput Ex. 1, General Power of Attorney of Donald C. Scafidi, dated May 14, 2007.) Chaput did not have the original promissory note. Instead, he only had a copy.[6] Further, because the copy he had was unsigned, in truth he only had a draft. According to the unsigned draft copy of the promissory note, which was admitted into evidence as Exhibit 1, the loan had to be repaid by May 29, 2010. However, Chaput had already filed his complaint against the Scafidis three months earlier, on February 11, 2010. Yet according to the notarial language (though unexecuted), the promissory note would have been notarized "[o]n this ___ day of ___, 2009." (Pl.'s Ex. 1.)

Sherry Lynn Young ("Sherry"), Chaput's "daughter,"[7] corroborated his testimony. Sherry said that she saw Patti and Chaput sign the note. "I was right there," she testified, "I was there when she typed it and then later when she signed it, as a witness." *Id.* at 27:25-26:1. The promissory note does not have space for a witness's signature, however. After the note was signed, Chaput filed it in a cabinet in a home office. Sherry could not recall exactly when Patti typed it. "Last year some time in 2010," she said. *Id.* at 26:5-6. When the court asked if she was sure the note was signed in 2010, Sherry responded, "I'm pretty sure." *Id.* at 28:19.

> [THE COURT:] And this was typed up in 2010. The beginning of the year, the middle of the year, or the end of the year, do you know? Do you remember? Could it have been summer, June, February, November?
>
> MS. YOUNG: About May.

---

[6] The document marked as Plaintiff's Exhibit 1 was initially submitted on May 25, 2010.

[7] The stenographer spelled the name as "Cheri Lynn Young." However, the record of proceedings the Clerk prepared spelled the name as Sherry Lynn Young. Chaput also spelled it as "Sherry" in his August 22, 2011 Motion and in his November 8, 2011 Petition for Review. Sherry's role is unclear. At trial, when asked about her relationship to Chaput, Sherry testified: "He is my dad." (Hr'g Tr. 25:5.) Chaput also referred to her as his "daughter" at trial. *See id.* at 24:5. But then, in his petition, he referred to her as his "housekeeper," not his daughter. In an email, which the Scafidis' daughter, April, sent from her mother's email account, April noted that Sherry was Chaput's "ward/witness/adopted daughter (we don't know how to address her)." (Email from Def.'s Patricia Scafidi 1, filed Dec. 10, 2010.)

THE COURT: May? And when it was typed up in May, you said she came back three months later to sign it?

MS. YOUNG: Yeah, because she was staying with us at the time.

THE COURT: So she came back in August.

MS. YOUNG: She actually was staying with us at the house at the time.

THE COURT: Okay. But she signed it three months later.

MS. YOUNG: Yes.

THE COURT: August of 2010?

MS. YOUNG: Somewhere, yeah, like that.

*Id.* at 28:23-29:14. After Sherry testified, Chaput called his stepson, John A. Cianci, as a witness. However, John testified that he never saw the promissory note.

The reason Chaput did not have the original note is because Patti stole it sometime after he filed the small claims case against her and Don. She "had access to all [his] records," he claimed. *Id.* at 7:5-6. Chaput also claimed that Patti's actions — acting as his realtor and agreeing to repay the loan from her commission — violated Article 5 of the Code of Ethics and Standards of Practice adopted by the National Association of Realtors because she had an "interest" in his purchase of the Inn at Pelican Heights. (*See* Chaput Ex. 2, Nat'l Assoc. of Realtors, Code of Ethics & Standards of Practice, Art. 5 (2011 ed.) ("REALTORS® shall not undertake to provide professional services concerning a property or its value where they have a present or contemplated interest unless such interest is specifically disclosed to all affected parties.").)

The Magistrate Court summarized the state of Chaput's case at this point as follows: "So you have a promissory note that's not signed, and you have a verbal agreement that's not in writing regarding the payment from a commission." *Id.* at 13:21-23. Chaput sought to bolster his case by referring the court to the cancelled checks that he attached to his complaint. One check, not numbered but dated July 28, 2009, was issued to Patty Scafidi for $1,000 for "services rendered." (Compl., Ex. 3.) Another check, number 1002 and dated August 3, 2009, was written to Patricia Scafidi for $2,350 for "property purchase assistance." *Id.* at Ex. 4. The third check, number 1019 and dated August 17, 2009, was written to "Patty Scafidi" for $500 for "realtor assistance." *Id.* at Ex. 3. The

174

checks totaled $3,850 and combined with the $6,000 wired on June 1, 2009, totaled $9,850. Chaput also referred the Magistrate Court to the note from USAA, which was also attached to his complaint. The note, which was sent by Margo Olivarez and printed on February 8, 2010, reads: "Dear Colonel Chaput, We received your request regarding the $6000.00 phone transfer that was debited from your account . . . on 6/1/09. The item in question was transferred to account . . . in the names of Donald C. or Patricia M. Scafidi." (Pl.'s Ex. 4.). Lastly, Chaput referred the court to the email from Patti to John on December 1, 2009, which was also attached to the complaint. In that email, Patti wrote, "[w]hatever is owed to Bob regarding the initial loan that started this mess will be paid for as agreed." (Pl.'s Ex. 3.) But the court was not convinced.

Regarding the promissory note, the Magistrate Court stated that it found Sherry's testimony unreliable because of the discrepancy in the dates. Chaput conceded the point.

> MR. CHAPUT: She may be confused with the time. I'm confused of it, and I was there.
> THE COURT: Well, I need to be not confused in order to give you a judgment.
> MR. CHAPUT: One thing I can prove, I gave her the money. They received it. And they also admitted that they owed it.
> THE COURT: They've always admitted that they don't owe you any money, unless you have something in writing where they say I owe . . . Mr. Chaput.

(Hr'g Tr. 32:13-24.) The court then asked, "[H]ow do I know it made it into the Scafidis' account . . . and how do I know what the $6,000 was for? Maybe they sold you the four paintings, and you paid them $6,000 for it." (Hr'g Tr. 37:14-18.) Chaput remarked, "Well, it's more than just a coincidence that we're talking about $6,000 and that the Scafidis are involved, and they're mentioned here.[8] I can't imagine coming up with something like this." *Id.* at 37:23-38:1.

The court then segued to Chaput's claim about the stolen gun. Chaput testified that it was a "25-caliber foreign pistol, stainless steel, small" that was "licensed and registered . . . to [his] wife" and "stolen by Patty

---

[8] Presumably referring to Plaintiff's Exhibit 4.

Scafidi." *Id.* at 40:17-18, 14-15, 12. He reported it stolen to the police. But he did not have documentation with him to support his claim or to support the amount he was claiming in damages. It was "just an estimate of my own," he admitted. *Id.* at 42:9.

After hearing all the testimony, the Magistrate Court announced its judgment from the bench.

> This matter comes before the Court on a small claims complaint filed by Mr. Robert J. Chaput v. Donald and Patty Scafidi.[9] Mr. Chaput indicates that on or about June of 2009, he loaned Mr. and Mrs. Scafidi $6,500. And, as evidence of that loan, Mr. Chaput submitted to the Court what's been marked as Plaintiff's Exhibit 1, a promissory note with collateral indicating that Patricia Scafidi, for Donald C. Scafidi, received $6,000 from Mr. Chaput. . . . Mr. Scafidi would place four of his paintings valued at $6,000 . . . as collateral for the loan.
>
> Mr. Chaput at one point in his testimony indicated that these paintings were in fact at one time in his home, and he allowed, even after the loan was made to the Scafidi, he allowed the collateral be taken out of his house and to a storage unit i[n] Sun Self-Storage. The promissory note submitted by Mr. Chaput was not signed by either . . . Patricia Scafidi or Mr. Chaput, although Mr. Chaput's testimony indicates that it was signed and that it was signed in front of his daughter, Ms. [Sherry] Young.
>
> Ms. [Sherry] Young testified that, yes, she did see a signed copy of this document, which was signed on or about May of 2010, or it was typed in May of 2010 and signed by Mrs. Scafidi and her father some time in August of 2010. Even though the document, if it was typed by Mrs. Scafidi, had a date of 2009 on it. And in the last paragraph of the document, it says if contract is not completed by June 1, 2010, all remaining collateral shall become the property of Robert Chaput, which indicates to this court that this document was in fact typed some time in 2009. And if it ever was signed, it was some time in 2009, so that [Sherry] Lynn Young's testimony is unreliable with regard to seeing a signed copy of this promissory note.

---

9 The stenographer spelled the defendants' last name "Scafidis." Scrivener's errors are omitted.

Mr. Chaput also represented his stepson, Mr. Cianci, who he originally claimed also saw a signed copy of the promissory note, and Mr. Cianci's testimony was that he never did see a signed copy of this promissory note.

Also in Mr. Chaput's complaint, he indicates that Mrs. Scafidi stole a gun from his residence, which was legally licensed to his wife. And when he found the gun missing, he did make a report, a police report, which he has failed to bring to court today. He indicated that he — Patty went to the police or he testified that Patty Scafidi went to the police, acknowledged that she stole the weapon, and the police failed to do anything about it. I find that testimony by Mr. Chaput unreliable.

Mr. Chaput also indicated that as evidence of the loan, he submitted Plaintiffs Exhibit 4, which is supposedly a text message from USAA with the notation that $6,000 had been transferred from his account to the account of Donald and Patricia Scafidi, and this was dated April 4, 2009. There's no indication on this message, one, whether the $6,000 did in fact make it into the Scafidis' account and, two, what the $6,000 was in reference to. It has no mention of any loan payment, so this Court has no way of knowing whether this in fact was a loan to the Scafidis.

*Id.* at 43:10-45:21. The Magistrate Court then dismissed Chaput's complaint with prejudice.

Chaput filed a request for appeal on November 8, 2011. The next day, the court reduced to writing its ruling. The order, entered November 10, 2011, stated that

[t]he Plaintiff appeared personally. The Defendants, although served, did not appear. The Defendants did notify the Court that they would be unable to appear and requested another continuance. This Court denied the Defendants' motion for a continuance because this matter has been continued on numerous occasions on request of the Defendants. This matter has been pending since February 11, 2010. After hearing testimony from the Plaintiff, the Court found that the Plaintiff failed to prove, by a preponderance of the evidence, his claim against the Defendants.

(Order 1, entered Nov. 10, 2011.)

177

Chaput submitted a request for a transcript of the bench trial on November 15, 2011, which was submitted on December 2, 2011. In the interim, the Clerk's Office construed Chaput's motion for appeal as a petition for review and assigned it to a Superior Court judge in the Appellate Division. Then, on December 13, 2011, Chaput filed a motion for leave to submit additional evidence to the Appellate Division in the interest of justice. Specifically, he requested leave to submit a copy of the police report he filed, a copy of a consent judgment entered in a forcible entry and detainer action, *Cianci v. Scafidi*, case number SX-10-CV-005, and a copy of a letter from USAA dated December 12, 2011. Two days later, December 15, 2011, Chaput filed his brief on review.

Meanwhile, on January 3, 2012, the Supervisor replied to an email Patti sent to the Clerk's Office regarding service of process. The Supervisor wrote, "I have located the file and from what I see the complaint named both you and Mr. Donald Scafidi. However, only Mr. Donald Scafidi was serve[d] with a copy of the complaint. The file will be forwarded to the Magistrate [Court]'s chamber for review." (Email to Def. Patricia Scafidi (Jan 3. 2012), filed Jan. 6, 2012.) The Supervisor further stated that the then-Clerk of the Superior Court instructed her to tell Patti to "fax a letter in writing" stating her "issues" because if she sent a letter, it was not received. *Id.*

Patti sent a letter by email on January 5, 2012. In her letter, she explained that

> [m]y only concern was that I saw my own name on a court order for the first time ever (within) the dismissal of the case. Certainly I am glad the case was dismissed; I just did not know why my name was on the dismissal as I had not seen it previously. I have never been served with a subpoena or an order to appear in court, as [the Supervisor] pointed out in her email. The court was kind enough to take my husband's sworn affidavit in lieu of him trying to come to St. Croix. Twice he sent a representative. The first time was our son — who was not allowed by Mr. Chaput to read Don's sworn statement; and the second time a friend (Donna Ealy) came to St. Croix at that time just to help but Mr. Chaput did not show and the case was continued again. I am sure that is all in the record.

(Def. Patricia Scafidi's Letter 1, docketed Jan. 5, 2012.) Two weeks later — and over two and a half months after Chaput filed for review — the Mag-

istrate Court amended its November 10, 2011 Order. The Amended Order, dated January 23, 2012 and entered January 23, 2012, provided as follows:

> The Plaintiff appeared personally, Defendant, Donald Scafidi, although served, did not appear. Defendant, Patti Scafidi was not served. Donald Scafidi did notify the Court that he would be unable to appear and requested another continuance. This Court denied the Defendant's motion for a continuance because this matter has been pending since February 11, 2010. After hearing testimony from the Plaintiff, the Court found that the Plaintiff had failed to prove, by a preponderance of the evidence, his claim against the Defendant, Donald Scafidi.

(Amend Order 1, entered Jan. 25, 2012.) The court did not cite Patti's January 5, 2012 letter or explain why it amended its dismissal order.

Subsequently, this Court,[10] by order entered March 18, 2014, notified the Scafidis that their time to file a brief in response to Chaput's brief had passed. The Court nonetheless *sua sponte* extended the deadline by ten days, but also warned that if they failed to file a brief, they would have waived their right to be heard on review. The Scafidis did not respond.

However, a month before the March 18, 2014 Order issued, Chaput "filed a voluntary Chapter 13 bankruptcy petition on February 6, 2014." *Cianci*, 64 V.I. at 686; *accord In re: Chaput*, 1:14-bk-10003, 2015 Bankr. LEXIS 1370, at *3 (Bankr. D.V.I. Apr. 16, 2015) ("The Plaintiff filed a chapter 13 petition on February 6, 2014."). Neither Chaput nor the trustee who was later appointed filed a notice in this case of bankruptcy stay. The bankruptcy case is still pending.[11]

## II. JURISDICTION AND STANDARD OF REVIEW

The Magistrate Division of the Superior Court has original jurisdiction to hear small claims cases. *See* 4 V.I.C. § 123(a)(4); *accord Brown v. Brown*, 59 V.I. 583, 588 (V.I. 2013) (*per curiam*). " 'All appeals from the Magistrate Division must be filed in the Superior Court.' The Appellate

---

[10] The judge initially assigned to this matter retired in 2013. Pursuant to a standing practice, the Clerk's Office reassigned the prior judge's cases to the undersigned judicial officer. The Clerk's Office did not issue notice to the parties of the reassignment, however.

[11] The Court takes judicial notice of the docket of Chaput's pending bankruptcy matter. *Cf. Cianci*, 64 V.I. at 690 n.2 (noting that a court "may take judicial notice of the contents of another [c]ourt's docket" (quotation marks and citations omitted)).

Division of the Superior Court was established to hear the appeals from the Magistrate Division." *Dennie v. People*, 66 V.I. 143, 149 (Super. Ct. App. Div. 2017) (quoting 4 V.I.C. § 125) (ellipsis omitted)). Here, the Magistrate Court dismissed Chaput's complaint after a bench trial and memorialized its decision by order entered November 10, 2011, as amended January 25, 2012. Chaput filed a request for review on November 8, 2011, which the Clerk's Office construed as a petition for review. *See* SUPER. CT. R. 322.1(b)(1)(B). Hence, his review was deemed filed on November 10, 2011, notwithstanding the amendment to the dismissal order. *See* SUPER. CT. R. 322.1(b)(2)(C) ("Where a petition for review is filed after an oral decision but before entry of a written order or judgment, it is deemed filed as of the date of the written order or judgment appealed from."). Accordingly, this matter is properly before the Appellate Division.

■ Before considering any of the errors Chaput raises on review, the Court must first determine whether this review was stayed automatically when Chaput filed for bankruptcy. Chaput "filed a voluntary Chapter 13 bankruptcy petition on February 6, 2014." *Cianci*, 64 V.I. at 686. The United States Code directs that "[a] voluntary case . . . is commenced by the filing with the bankruptcy court of a petition." 11 U.S.C. § 301(a). "[A] petition filed under section 301 . . . operates as a stay . . . of . . . [the] continuation . . . of a judicial . . . proceeding against the debtor that was . . . commenced before the commencement of the [bankruptcy] case." *Id.* § 362(a). Filing a petition for bankruptcy automatically stays all proceedings against the debtor. "The stay is automatic because it is triggered as against all entities upon the filing of a bankruptcy petition, irrespective of whether the parties to the proceedings stayed are aware that a petition has been filed." *Cianci*, 64 V.I. at 689 (quotation marks and citation omitted).

Chaput filed his complaint on February 10, 2010 and filed a petition for review of the dismissal of that complaint on November 8, 2011. Thus, his internal appeal was pending before he filed a voluntary petition for bankruptcy. "[C]ourts have universally held that an appeal from a case filed against a debtor is a *continuation* of a judicial, administrative, or other action or proceeding against the debtor." *Brouillard v. DLJ Mortg. Capital, Inc.*, 60 V.I. 763, 765 (V.I. 2014) (*per curiam*) (quotation marks and ellipsis omitted) (citing *Teachers Ins. & Annuity Ass'n of Am. v. Butler*, 803 F.2d 61, 64-65 (2d Cir. 1986); *Cathey v. Johns-Manville Sales*

*Corp.*, 711 F.2d 60, 62 (6th Cir. 1983); *Ellison v. Nw. Eng'g Co.*, 707 F.2d 1310, 1311 (11th Cir. 1983); *Assoc. of St. Croix Condo. Owners v. St. Croix Hotel Corp.*, 682 F.2d 446, 449 (3d Cir. 1982)). Therefore, at first glance, this internal appeal from the Magistrate Division might also be stayed. However, this case is different because neither the small claims case, nor the review filed from that case, are proceedings against the debtor. Rather, both are proceedings by the debtor. The question becomes whether the Court can proceed to the merits or must instead either hold this matter in abeyance or dismiss the review without prejudice. *Cf. Brouillard*, 60 V.I. at 766-67 (appellate courts either hold an appeal "in abeyance" or "dismiss . . . without considering the merits of the underlying case" when a bankruptcy stay is in place).[12]

 The purpose of the automatic stay " 'is to preserve what remains of the debtor's insolvent estate and to provide a systematic equitable liquidation procedure for all creditors, secured as well as unsecured, thereby preventing a chaotic and uncontrolled scramble for the debtor's assets in a variety of uncoordinated proceedings in different courts.' " *Cianci*, 64 V.I. at 692 (quoting *In re: Holtkamp*, 669 F.2d 505, 508 (7th Cir. 1982)). For this reason, federal courts, relying on the plain language of the bankruptcy code and a common sense reading of its provisions, distinguish proceedings *against* the debtor from proceedings *by* the debtor. *See, e.g., McDonough Assocs., Inc. v. Grunloh*, 722 F.3d 1043, 1048 n.3 (7th Cir. 2013) ("The automatic stay under 11 U.S.C. § 362(a)(1) for judicial proceedings against the debtor does not apply to suits brought by the debtor." (citing *Cathey*, 711 F.2d at 61-62; *Ass'n of St. Croix Condo. Owners*, 682 F.2d at 449; *In re: Mid-City Parking, Inc.*, 332 B.R. 798, 807 (Bankr. N.D. Ill. 2005) (internal citation omitted))); *accord Olick v. Parker & Parsley Petroleum Co.*, 145 F.3d 513, 516 (2d Cir. 1998) ("As the district court correctly pointed out, the automatic stay pursuant to 11 U.S.C. § 362 enjoins actions '*against* the debtor' (emphasis supplied). It prevents the commencement or continuation, after a bankruptcy petition has been filed, of lawsuits and proceedings to recover

---

[12] The Supreme Court of the Virgin Islands held in *Brouillard* that dismissing an appeal without prejudice "represents the sounder method for achieving compliance with the federal mandate." 60 V.I. at 766. The Court was, of course, making that pronouncement for appeals to that court. That is, *Brouillard* did not decree that dismissal is the soundest approach for all appeals pending in any court in the Virgin Islands where an automatic stay may be in place.

a claim against the debtor that arose before the filing of the petition. In the case at bar, the opposite occurred: No party sought to recover a claim 'against' Olick; rather, Olick sought to recover from the settlement fund." (internal citations omitted)). If Chaput had prevailed at trial and the Scafidis filed for review, and while on review Chaput filed for bankruptcy, then this review *might* have to be stayed. Federal courts are divided whether an appeal is stayed automatically when a case was filed by the debtor, but the appeal is taken "against" the debtor. *Compare Ass'n of St. Croix Condo. Owners*, 682 F.2d at 449 ("It might be argued that whether an appeal is stayed by section 362 should be determined by whether the appeal is taken 'by' or 'against' the debtor, i.e., whether the debtor is the appellant or appellee. We reject this approach."), *with McDonough Assocs.*, 772 F.3d at 1048 n.3 ("The fact that plaintiff McDonough is now the appellee does not matter. Whether a suit is 'against the debtor' depends on the party's status at the time the initial action was filed."). Here, Chaput was the plaintiff and also the appellant (or petitioner in the Appellate Division), so the automatic stay does not apply.

▮ Nonetheless, an additional wrinkle could be present based on the type of bankruptcy case Chaput commenced. A New York court recently succinctly summarized the differences between bankruptcy proceedings governed by Chapters 7, 11, and 13 of the bankruptcy code. *See generally West v. Young*, 38 Misc. 3d 1030, 958 N.Y.S.2d 282, 284-86 (Sup. Ct. 2013). Chaput filed a Chapter 13 bankruptcy proceeding. *West* explains that Chapter 13 debtors can pursue pre-petition claims and further that the automatic stay does not apply to proceedings commenced by the debtor. Since Chaput filed the small claims case against the Scafidis and also filed for review in the Appellate Division, both proceedings were filed by him, the debtor. Pursuant to *West* and the cases cited therein, Chaput retained the right to pursue this matter.[13] Therefore, the Court can decide this review.

---

[13] Whether Chaput's right to pursue this case is exclusive or shared concurrently with the trustee of his bankruptcy estate is not for this Court to decide. However, Chaput did not inform the bankruptcy court that this internal appeal was still pending. (*See* Exhibit Form 7. Stmt. of Fin. Aff. 2, *In re: Chaput*, 1:14-bk-10003 (Bankr. D.V.I. Mar. 3, 2014), ECF No. 9-11 (listing *Flagstar Bank v. Chaput*, case number 1:13-cv-08 (D.V.I.) and *Chaput v. Cianci*, case number SX-12-CV-338 (V.I. Super. Ct.) in section 4, under "[s]uits and administrative proceedings, executions, garnishments and attachments.").) Out of an abundance of caution, the Court will direct that a copy of this opinion and order be served on the trustee appointed to Chaput's estate.

Having determined that Chaput's bankruptcy case does not automatically stay this review, the Court turns to the errors Chaput asserts. In his brief, he raises three errors. First, Chaput argues that the evidence was sufficient to support his claims and that the Magistrate Court "erred by not allowing [him] the opportunity to clarify" the inconsistencies in his proof. (Pet'r's Br. 8, filed Dec. 15, 2011.) Next, Chaput argues that the Magistrate Court erred by relying on "communications and or evidence" from the Scafidis that was not in evidence because they "defaulted by not appearing." *Id.* at 11. His last point concerns the stolen pistol specifically and the evidence he submitted in support.

▮ The Appellate Division of the Superior Court "function[s] like an appellate court with the Magistrate Division functioning as the trial court." *Dennie*, 66 V.I. at 149 (quotation marks and citation omitted). "[C]ases in the Magistrate Division are decided without a jury," so the magistrate court "presid[es] over the case from commencement through dismissal or issuance of a judgment." *George v. People*, SX-16-RV-002, 2017 V.I. LEXIS 58, at *5 (Super. Ct. App. Div. Apr. 5, 2017) (quotation marks and citations omitted). The magistrate court "hears the testimony and considers the evidence before finding the facts and applying the law." *Carlos Warehouse v. Thomas*, 64 V.I. 173, 180 (Super. Ct. App. Div. 2016) (citing *In re: Estate of Small*, 57 V.I. 416, 428-29 (V.I. 2012)). On review, the appellate court "must address each of the errors the parties address in their briefs, except any errors that have been waived." *Dennie*, 66 V.I. at 149 (citations omitted)). When considering their arguments, the appellate court reviews the facts found by the magistrate court for clear error, *see* SUPER. CT. R. 322.3(b)(1), and defers to the magistrate court's credibility determinations, " 'including which witnesses' testimony to credit and how much weight to give such testimony.' " *Dennie*, 66 V.I. at 149 (quoting *David v. People*, SX-15-RV-007, 2016 V.I. LEXIS 15, at *10 (Super. Ct. App. Div. Feb. 22, 2016)). But "[t]he appellate court does not defer to the law the magistrate court applied." *Id.* at 149 (quotation marks and citation omitted)). Questions of law are reviewed under a plenary standard. *Accord Feddersen v. Feddersen*, 41 V.I. 230, 236 (D.V.I. App. Div. 1999) ("The 'clearly erroneous' standard protects findings of fact from reversal to a certain extent, but does not apply to findings of law, which are reviewed *de novo*." (citation omitted)). Appellate courts adhere to these standards because otherwise it "would render the proceedings that occurred . . . a complete nullity, and . . . would signal . . . that the

work . . . dedicated to constructing the record is a complete waste of time." *Henry v. Dennery*, S. Ct. Civ. No. 2012-0130, 2013 V.I. Supreme LEXIS 4, at *7 (V.I. Jan. 11, 2013) (footnote omitted).

## III. DISCUSSION

■ It is difficult to unpack all of the issues raised by a review of the record of this case. Further complicating the matter is that some of the points Chaput raises in his brief overlap at times, which is understandable as he represented himself both at trial and on review. As an intermediate appellate court, this Court must address each point raised on review. *See Gardiner v. Diaz*, 58 V.I. 199, 205 n.5 (V.I. 2013) ("[I]t would generally be error for the Appellate Division of the Superior Court to fail to address the arguments raised in the brief on review."). To that end, the Court will construe Chaput's first point as a challenge to the sufficiency of the evidence and address all of his evidentiary concerns, including his arguments regarding the stolen pistol, in the same section. Next, the Court will address Chaput's claim that the Magistrate Court erred when it considered matters outside the record. The Court will address last Chaput's claim that the Magistrate Court erred by not letting him clarify his evidence as well as his motion to submit additional evidence on review.

### A. Sufficiency of the Evidence

■ Before proceeding to trial, the court must first determine what claims are alleged in the complaint and — if more than one defendant — against whom. *Cf. Der Weer v. Hess Oil V.I. Corp.*, 64 V.I. 107, 135 (Super. Ct. 2016) (observing that courts must determine what claims are presented and what law governs since the law determines what facts are relevant); *Carlos Warehouse*, 64 V.I. at 198 n.8 (noting that parties are without counsel in small claims cases, and many defenses are deemed waived if not raised, and concluding that the prudent course is for courts to elicit affirmative defenses first before attempting to settle the case); *see also In re: Moorhead v. Mapp*, 62 V.I. 595, 601 n.6 (V.I. 2015) ("[W]hen a document has been filed by a *pro se* litigant . . . the Superior Court is required to apply a more liberal pleading standard to determine what claims are actually being asserted." (citing *Joseph v. Bureau of Corr.*, 54 V.I. 644, 650 (V.I. 2011)); *cf. Perez v. Puerto Rico*, 100 F. Supp. 3d 88,

91 (D.P.R. 2015) (" 'The policy behind affording *pro se* plaintiffs liberal interpretation is that if they present sufficient facts, the court may intuit the correct cause of action, even if it was imperfectly pled.' " (quoting *Ahmed v. Rosenblatt*, 118 F.3d 886, 890 (1st Cir. 1997)). Here, Chaput named two people — Donald Scafidi and Patricia Scafidi — in his February 11, 2010 complaint. He also asserted multiple claims in that complaint. The Magistrate Court should have determined whether each claim was asserted against both Patti and Don. Liability in the Virgin Islands is joint and several, 5 V.I.C.§ 1451(d), but not for claims not asserted against any other defendant. Here is where the errors begin.

■ The first claim Chaput stated in his complaint concerned the six thousand dollars he supposedly wired to the Scafidis. This was a claim for debt. He asserted it against both of the defendants. Chaput's second, third, and fourth claims were also for debt, but he only asserted them against Patti. In his complaint, Chaput alleged that "Patti requested additional loans." (Compl. 1.) He attached copies of the cancelled checks written to Patti in support. Clearly, the claims related to the cancelled checks were not asserted against Don. Chaput's last claim was also couched as a debt claim: the value of the gun Patti allegedly stole from Chaput's house. However, in truth, Chaput asserted a claim for conversion. *See, e.g., Shmueli v. Corcoran Group*, 9 Misc. 3d 589, 802 N.Y.S.2d 871, 875 n.2 (Sup. Ct. 2005) ("The basic essence of conversion is civil theft, capable of resulting in a transfer of the stolen property to a third party, and, thus, giving rise to a compensatory remedy for its value, if not retrievable for the owner." (citations omitted)). Here too, Chaput asserted this claim only against Patti, not Don. Having identified the claims Chaput stated in his complaint, the Court turns now to the law and the evidence presented in support of each claim.

### i. The $6,000 Wire Transfer

■ "To state a common law claim for debt under Virgin Islands law, the plaintiff must allege that the defendant owes a certain amount and that the defendant is or should be obligated to pay that amount."[14] *Carlos*

---

[14] At the time when Chaput filed his complaint, and when the bench trial finally occurred, courts in the Virgin Islands applied the common law as stated in the Restatements of the Law approved by the American Law Institute, pursuant to section 4 of title 1 of the Virgin Islands Code. Subsequently, however, the Supreme Court of the Virgin Islands decreed that "the

*Warehouse*, 64 V.I. at 192. Chaput stated a claim for debt. He alleged in his complaint that he loaned $6,000 "to Donald and Patricia Scafidi." (Compl. 1.) He testified under oath at trial that he loaned $6,000 to them. He moved into evidence a statement from USAA, marked as Exhibit 4, that corroborated his testimony. Plaintiffs Exhibit 4 shows that on June 1, 2009, $6,000 was transferred from Chaput's bank account to an account "in the names of Donald C. or Patricia M. Scafidi." (Pl. Ex. 4.) This evidence was unrefuted and sufficient to prove a debt claim.

The Magistrate Court concluded that Chaput did not prove his claim. The court instead held that Chaput had to corroborate his own testimony and evidence.

> THE COURT: Well, you have an interest a[t] stake here. I mean, you have to corroborate what you're telling me.
>
> MR. CHAPUT: Well, I think I've pretty well corroborated it. I proved that the money went from my bank to their bank. They mention their names here in USAA's correspondence.
>
> THE COURT: All this proves is that — it's an indication that possibly $6,000 went from your account to the Scafidis.

(Hr'g Tr. 38:16-25; *see also id.* at 45:16-21 (referring to Exhibit 4) ("There's no indication on this message, one, whether the $6,000 did in fact make it

---

Restatements may be persuasive authority in determining the common law, [but] they 'no longer constitute binding legal authority in this jurisdiction.' " *Isaac v. Crichlow*, 63 V.I. 38, 58 (Super. Ct 2015) (quoting *Banks v. Int'l Rental & Leasing Corp.*, 55 V.I. 967, 984 (V.I. 2011)). Now, in the absence of "local law . . . or binding precedent . . . the Superior Court must conduct a '*Banks* analysis' to determine the applicable common law." *Id.* At the time of trial, no court in the Virgin Islands had considered what law governs simple debt claim actions. The Magistrate Court also failed to state what law it was applying. In that instance, this Court, as an intermediate appellate court, could either remand this matter to the trial court for it to perform the necessary analysis in the first instance, *see, e.g.*, *Wild Orchid v. Banco Popular de P.R.*, 62 V.I. 240, 253 (Super. Ct. App. Div. 2015), or undertake the analysis for this first time on review. *See Carlos Warehouse*, 64 V.I. at 184. In this instance, another appellate court judge conducted a *Banks* analysis and concluded both that it "is unquestionably the soundest rule for the Virgin Islands to recognize a claim for debt," *id.* at 192 (quotation marks and internal citation omitted), and further identified what law should govern a common law claim for debt and how to state a debt claim under Virgin Islands law. *See id.* The Court adopts and incorporates the *Banks* analysis conducted by *Carlos Warehouse. Accord Corcino v. Nations*, SX-09-CV-194, 2016 V.I. LEXIS 75, at *4 n.2 (Super. Ct. June 21, 2016) (adopting another court's reasoned decision and the *Banks* analysis performed therein) ("This Court sees no reason to depart from that ruling . . . [and] adopts the reasoning opined in that decision.").

into the Scafidis' account and, two, what the $6,000 was in reference to. It has no mention of any loan payment, so this Court has no way of knowing whether this in fact was a loan to the Scafidis.").) There are two reasons why this was in error. First, Chaput did not have to prove his debt claim because the Scafidis defaulted. Second, Chaput did not have to corroborate his own testimony and evidence. So, Chaput is correct. He presented sufficient evidence to prove his first claim for debt.

█ Once the case was called for trial and the Scafidis failed to step forward, the court clerk should have entered their default. Superior Court Rule 47 directs that "[w]hen a party against whom affirmative relief is sought . . . has failed to appear at the time fixed for trial, the clerk *shall enter his default*." (emphasis added)) (applicable via SUPER. CT. R. 65). "Shall normally suggests something mandatory not discretionary." *Dennie*, 66 V.I. at 152 n.6 (citing *Shoy v. People*, 55 V.I. 919, 927 (V.I. 2011)). The Scafidis did not appear. They could not appear through a surrogate.[15] *See Gore v. Tilden*, 50 V.I. 233, 239 (V.I. 2008) (*per curiam*). By not appearing they defaulted and by defaulting they admitted to the allegations in the complaint. *See Redemption Holdings, Inc. v. Gov't of the V.I.*, 65 V.I. 243, 255 (V.I. 2016) ("[W]hen default is entered against a defendant, the defendant is admitting only to the allegations against him as alleged in the charging document." (citing *King v. Appleton*, 61 V.I. 339, 346 (V.I. 2014)); *see also King*, 61 V.I. at 346 ("Because Mackchesney, by his default, admitted the plaintiff's well-pleaded allegations of fact, he is concluded on those facts by the judgment, and is

---

[15] Since parties cannot appear through surrogates in the Small Claims Division, inviting the Scafidis to send a representative was in error. *See Gore*, 50 V.I. at 238-39 (affirming trial court's refusal to allow another person to "simply pretend" "and stand up in . . . place" of the defendant based on the "clear statutory prohibition against surrogate representation of individuals" in the Small Claims Division (citing 4 V.I.C. § 112(d)). The court's invitation was also improper for another reason: allowing Max or Donna Ealy to represent the Scafidis could have been construed as sanctioning or inviting them to engage in the unauthorized practice of law. *See* 4 V.I.C. § 443(a) ("[The unauthorized practice of law shall be deemed to mean the doing of any act by a person who is not a member in good standing of the Virgin Islands Bar Association for another person usually done by attorneys-at-law in the course of their profession . . . [including] . . . the appearance, acting as the attorney-at-law, or representative of another person . . . before any court . . . authorized . . . to determine any question of law or fact or to exercise any judicial power."). The court's efforts to accommodate the Scafidis, given their circumstances and health problems, is laudable, but all accommodations by courts must occur within the bounds of the law.

barred from contesting the facts thus established." (quotation marks, brackets, and citations omitted)).

■ Thus, at the juncture where the defendant has failed to appear and default has been entered and the plaintiff is prepared to go forward with the trial — the court should then determine whether the complaint states a valid claim for relief under Virgin Islands law. Plaintiffs do not win by default just because defendants fail to appear. "[A] defendant's default does not in itself warrant the court in entering a default judgment. [Instead, t]here must be a sufficient basis in the pleadings for the judgment [to be] entered." *Id.* (quotation marks and citations omitted). In other words, the Magistrate Court still had "to determine" if the facts Chaput alleged in his complaint constituted "a valid cause of action under Virgin Islands law, and if so, to hold a default judgment hearing to establish the amount of damages." *King*, 61 V.I. at 346 (footnote omitted). However, a default judgment hearing is not necessary if damages are unavailable. Superior Court Rule 63(c) directs that "[i]f the defendant fails to appear, judgment may be entered by default where the claim is for a liquidated amount, or judgment may be entered upon *ex parte* proof where the claim is unliquidated."

■ " 'Liquidated' means adjusted, certain, settled with respect to amount, fixed." *Hallett Constr. Co. v. Iowa State Highway Comm'n*, 139 N.W.2d 421, 426 (Iowa 1966) (citation omitted); *accord Patray v. N.W. Publ'g, Inc.*, 931 F. Supp. 865, 869 (S.D. Ga. 1996) ("Generally, damages may be awarded without a hearing if they are for a liquidated amount, which means a sum certain." (quotation marks and citation omitted)). *But cf. Zorach v. Lenox Oil Co.*, 1996 Mass. App. Div. 11, 13 ("Merely requesting a specific amount in the complaint or statement of damages does not fulfill the sum certain requirement." (citations omitted)). A claim for debt is a valid cause of action under Virgin Islands law. *Cf. Carlos Warehouse*, 64 V.I. at 185-87 (collecting cases); *id.* at 192 (debt claims recognized). A simple debt claim is a liquidated-amount claim because the sum owed is certain and because "[d]amages are ordinarily not available." *Id.* Chaput stated a claim for debt against the Scafidis. Because the claim was for a certain amount, a default judgment hearing was not necessary. By defaulting, the Scafidis admitted that USAA wired them $6,000 to an account either in Don or Patti's name. At that point, the Magistrate Court could have entered judgment by default

against the Scafidis in the amount of $6,000 on Chaput's first claim,[16] since the claim is valid, the Scafidis admitted the allegations by default, and the claim was for a liquidated amount.

█ But even if the small claims court has the discretion to conduct a default judgment hearing when a plaintiffs claim is for a sum certain, *cf.* SUPER. CT. R. 63(c) ("judgment *may* be entered by default where the claim is for a liquidated amount" (emphasis added)), the proof Chaput submitted here was sufficient. Every plaintiff has a stake in his own case and every party's testimony is self-serving. "Deposition testimony, affidavits, responses to interrogatories, and other written statements by their nature are self-serving. . . . [T]he term 'self-serving' [should] not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story." *Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013) (citations omitted)); *accord Maher v. City of Chicago*, 406 F. Supp. 2d 1006, 1014 (N.D. Ill. 2006) ("All testimony — and all documents — offered by or on behalf of a party may fairly be said to be self-serving; why else would they be offered."). Chaput did not have to corroborate his own testimony or evidence.

█ █ Corroborating evidence might have been necessary if the Scafidis had appeared and testified that, after Chaput loaned them money, they all agreed that Chaput would keep one of Don's paintings and treat the $6,000 as payment. This is, in a sense, what the Magistrate Court was driving at. (*See* Hr'g Tr. 37:16-19 ("[H]ow do I know what the $6,000 was for? Maybe they sold you the four paintings, and you paid them $6,000 for it, and you have the four paintings.").) Accord and satisfaction — or "an agreement to substitute for an existing debt some alternative form of discharging that debt, coupled with the actual discharge of the debt by the substituted performance," *Huml v. Vlazny*, 2006 WI 87, 293 Wis. 2d 169, 716 N.W.2d 807, 816 n.9 (2006) (brackets omitted) (quoting BLACK'S LAW DICTIONARY 17 (7th ed. 1999)) — is an affirmative defense to a debt claim like payment. *See* V.I. R. CIV. P. 8(c)(1).[17] But courts cannot raise

---

[16] In fact, if Chaput had filed his complaint in the Civil Division and the Scafidis had failed to answer or appear, Chaput could have obtained a judgment by default from the Clerk. *See generally* SUPER. CT. R. 48(a)(1) (rule then in effect).

[17] "On April 3, 2017, the Supreme Court of the Virgin Islands adopted the Virgin Islands Rules of Civil Procedure which went into effect on March 31, 2017." *Hawkins v. Greiner*, 66 V.I. 112, 116 n.3 (Super. Ct. 2017) (*citing In re: Adoption of the VI Rules of Civ. Pro*, Prom.

and accept affirmative defenses on behalf of the parties, particularly parties that are in default. *Accord Malloy v. Reyes*, 61 V.I. 163, 175 n.9 (V.I. 2014) ("It is unquestionably error for the Superior Court to raise an affirmative defense *sua sponte* on behalf of a defending party where that party has waived the issue by failing to raise it or support it with evidence." (citing *Better Bldg. Maint. of the V.I. v. Lee*, 60 V.I. 740, 761 (V.I. 2014)). Courts must be fair and impartial to all sides and lenient with *pro se* parties. But "lenience has [its] limits . . . . The court may not assume the role of advocate or rewrite pleadings to include claims that were never presented." *Phillip v. Marsh-Monsanto*, 66 V.I. 612, 622 (V.I. 2017) (quotation marks and citations omitted). The same applies to affirmative defenses not raised.

It is understandable, however, why the Magistrate Court was led astray. There were a number of red herrings in this case. *See* MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1042 (11th ed. 2005) (defining red herring as "something that distracts attention from the real issue."). The promissory note was one of them. Chaput devoted an inordinate amount of time attempting to prove that he and Patti signed a promissory note. But he did not have a signed note. At best, he had a draft. But even if he and Patti had signed a promissory note, the issue was a red herring because it "distract[ed] attention from the real issue." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1042 (11th ed. 2005). The real issue was whether Patti Scafidi, Don Scafidi, or both owed Chaput $6,000.

 "Ordinarily, a promissory note is the primary evidence of the indebtedness." *Fed. Farm Mortg. Corp. v. Bollinger*, 108 P.2d 492, 494 (Kan. 1940). A promissory note is "an unconditional contract to pay, and parol evidence cannot be admitted to alter its terms." *Kothari v. Patel*, 262 Ga. App. 168, 585 S.E.2d 97, 103 (2003) (citation omitted). If Chaput had

No. 2017-001, 2017 V.I. Supreme LEXIS 22 (V.I. Apr. 3, 2017)). The Virgin Islands Rules of Evidence also took effect at the same time. *See In re: Adoption of V.I. Rules of Evid.*, Prom. No. 2017-002, 2017 V.I. Supreme LEXIS 21 (V.I. Apr. 3, 2017). How the Appellate Division should approach Virgin Islands Rule of Civil Procedure 1-1(c), and whether the Virgin Islands Rules of Evidence apply retroactively, are unanswered questions. However, because the newly promulgated rules are nearly identical to the rules that were in effect when this case was heard, the Court cites the new rules only for the sake of convenience. Otherwise, the Rules of the Superior Court in effect at the time of trial are cited where necessary.

a signed copy, it would have been relevant. *See* V.I. R. EVID. 902(9) ("Commercial paper, a signature on it, and related documents, to the extent allowed by general commercial law" are self-authenticating). But he did not have a signed note. He attempted instead to show that the draft he had proved that he loaned Patti and Don $6,000. Generally, the "original writing . . . is required in order to prove its content." V.I. R. EVID. 1002. This principle, known as the best evidence rule, provides "that where the contents of a writing are desired to be proved, the writing [the primary evidence] itself must be produced or its absence sufficiently accounted for before other evidence of its contents can be admitted." *Bradshaw v. Commonwealth*, 16 Va. App. 374, 429 S.E.2d 881, 884, 9 Va. Law Rep. 1335 (1993) (quotation marks and citations omitted). Virgin Islands law recognizes the best evidence rule. *See, e.g., Ostalaza v. People*, 58 V.I. 531, 564-66 (V.I. 2013). But Virgin Islands law also recognizes that

> [o]nce the original is not available, the law does not establish preferences as to what type of evidence may be used to prove the contents of the original. Where all originals are lost or destroyed and no bad faith caused their destruction, any form of secondary evidence will suffice and challenges to the secondary evidence go to weight, not admissibility. Because there are no degrees of secondary evidence, the Rule does not recognize a preference for duplicates over other forms of secondary evidence of contents. For this reason, evidence that does not qualify as a duplicate under Rule 1003 may still be admitted under Rule 1004, so long as the original has been lost or destroyed not in bad faith.

*Id.* at 564-65 (quotation marks, brackets, ellipsis, and citations omitted). Secondary evidence — here an unsigned, undated draft promissory note and testimony in support — may have been relevant since Chaput claimed the original was lost. *See* V.I. R. EVID. 1004(a). But all of the testimony about the promissory note — that is, who typed it, whether it was signed, when it was signed, who witnessed the signing, whether it was stolen, when was it stolen — was not relevant because Chaput was not suing the Scafidis to enforce the security interest he allegedly had in Don's paintings. *See generally* 11A V.I.C. § 9-203(b). Instead, he was suing them for debt. "[T]he elements of the debt claim include the existence of the loans, their terms, and

191

the failure of the defendants to repay them." *Carlos Warehouse*, 64 V.I. at 193 (quotation marks and citation omitted).

While the terms of the $6,000 loan might very well have included the signing of a promissory note, the note itself was not necessary to prove the claim. Trial courts decide what evidence is relevant. Here, allowing Chaput to devote an inordinate amount of time to proving that he and Patti signed a promissory note was in error because it was not relevant to prove his debt claim against Patti and Don. The Magistrate Court instead should not have admitted the draft note into evidence, should have instructed Chaput not to testify about it, and prevented him from questioning his witnesses about it. Further, considering that Chaput was representing himself, the court also should have excluded the evidence and testimony about the note when rendering its ruling. Instead, the Magistrate Court furthered the confusion by asking even more questions about the note and then compounded its error by basing its decision on it:

> THE COURT: So my dilemma is, why this document has a date of 2009.
>
> MR. CHAPUT: Well, that's because that's when it was typed.
>
> THE COURT: The testimony from your daughter said, and I asked her several times, she said 2010, May of 2010.
>
> MR. CHAPUT: She may be confused with the time. I'm confused of it, and I was there.
>
> THE COURT: Well, I need to be not confused in order to give you a judgment.

(Hr'g Tr. 32:6-16.)

Assuming that the small claims court retains the discretion to hold a default judgment hearing on a claim for a sum certain, *but cf., e.g., KPS & Assocs. v. Designs by FMC, Inc.*, 318 F.3d 1, 19 (1st Cir. 2003) ("Following the entry of default, a district court can enter a final judgment without requiring further proof of damages only in limited situations. For example, no evidentiary inquiry is necessary if the claim is for a 'sum certain.' "), the court still erred here by holding that Chaput had to corroborate his own evidence and then by relying on irrelevant evidence. The dismissal of Chaput's complaint with prejudice must be reversed and this matter remanded for the court to enter judgment by default in favor of Chaput jointly and severally against Don and Patti as to the portion of his complaint that stated a debt claim against the defendants for $6,000.

### ii. The Cancelled Checks

Chaput's other claims, also for debt, concerned money that he claimed he loaned to Patti as shown by the checks he attached to his complaint. Chaput alleged that he wrote three checks to Patti, in an amount totaling $3,850, which were "additional loans she promised to pay upon receiving her commission." (Compl. 1.) On review, Chaput argues that he "presented additional evidence to substantiate additional money other than the original loan and agreement of $6,[0]00." (Pet'r's Br. 10.) He is correct. The evidence shows that he paid $3,850 to Patti. But he is not correct that the Magistrate Court "erred in not considering and or reviewing" this evidence. The Magistrate Court correctly concluded that Chaput failed to state a claim for debt. The court's error was not identifying the law and not making any findings before it reached its conclusion. Here, however, the error is harmless.

■ A check is a type of commercial paper, specifically a negotiable instrument. *See* 11A V.I.C. § 3-104(f) ("A check means . . . a draft . . . payable on demand and drawn on a bank."); *accord Travelers Cas. & Sur. Co. v. Wash. Tr. Bank*, 186 Wn.2d 921, 383 P.3d 512, 517 n.5 (2016) ("A check is one type of negotiable instrument. A "check" is a draft, or order, that is payable on demand and drawn on a bank." (citation omitted)). "[B]roadly viewed, cashing a check is a commercial act governed by the law of commercial transactions." *Stop & Shop Supermarket Co. v. Loomer*, 65 Mass. App. Ct. 169, 837 N.E.2d 712, 718 n.9 (2005). Accordingly, "[t]he date and any information listed in the 'for' line of a check is relevant to the check's purpose." *GEICO Indem. Co. v. Smith*, 3:12-cv-08127, 2017 U.S. Dist. LEXIS 52471, AT *5 (D. Ariz. Apr. 5, 2017) (footnote omitted).

■ ■ Chaput fails to realize that the documents he attached to his complaint and his complaint itself were internally inconsistent. Both in his complaint and at trial Chaput claimed that he wrote the three checks to Patti as additional loans above and beyond the $6,000 loan. But each check shows otherwise. The "for" line on each of the checks states that Chaput paid Patti for "realtor assistance," for "services rendered," and for "property purchase assistance." (*See* Compl., Ex. 4.) None of the checks state that Chaput issued them as loan. It was for the trial court to resolve the inconsistencies. Further, as noted above, each check was issued to Patti, not to Don or to the Scafidis jointly. While the Magistrate Court

193

should have differentiated between the defendants and questioned Chaput whether his claim was against both, the error is harmless here. The complaint clearly failed to state a claim against Don regarding the cancelled checks and was internally inconsistent as to Patti. Chaput alleged that he issued the checks to Patti as loans but the checks attached to his complaint contradicted that allegation. Again, assuming the Magistrate Court had the discretion to hold a default judgment hearing, Chaput's own testimony conflicts with the checks themselves. Conflicts in evidence are resolved by the trial court. *Cf. David*, 2016 V.I. LEXIS 15, at *21. Accordingly, the decision to dismiss Chaput's debt claims must be affirmed.

### iii. The Stolen Gun

██ Chaput's last point concerns the gun he claimed that Patti stole from his house. As stated above, this claim was not a claim for debt but rather a claim for conversion. Conversion is a cause of action from the common law. *See PCO, Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP*, 150 Cal. App. 4th 384, 58 Cal. Rptr. 3d 516, 525 (2007) ("The tort of conversion is derived from the common law action of trover. The gravamen of the tort is the defendant's hostile act of dominion or control over a specific chattel to which the plaintiff has the right of immediate possession." (citations omitted)); *Bondi v. Citigroup, Inc.*, 423 N.J. Super. 377, 32 A.3d 1158, 1190 (App. Div. 2011) ("The common law tort of conversion is defined as the intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." (quotation marks and citations omitted)); *cf. Heldenmuth v. Gran*, 128 So. 3d 895, 896 n.2 (Fla. Ct. App. 2013) ("Case law does not seem to make a clear delineation between conversion and civil theft. It appears conversion is a common law tort and civil theft is a tort that draws support from statutes."); *accord Isaac v. Crichlow*, 63 V.I. 38, 59 (Super. Ct. 2015) ("No local statute addresses conversion."). The Supreme Court of the Virgin Islands has acknowledged conversion claims. *See, e.g., United Corp. v. Hamed*, 64 V.I. 297, 300 (V.I. 2016) (noting the plaintiff had sued for conversion among other claims); *see also V.I. Waste Mgmt. Auth. v. Bovoni Invests., LLC*, 61 V.I. 355, 372 (V.I. 2014) (remanding conversion claim for further determination). But the Court has yet to address whether the common law

of the Virgin Islands recognizes conversion as a cause of action and if so, what specific rules govern conversion claims. *Accord Isaac*, 63 V.I. at 59 ("It further appears that the Supreme Court of the Virgin Islands has yet to adopt a rule that reflects the common law regarding conversion.").

 However, at the time when Chaput filed his complaint, conversion was recognized in the Virgin Islands as a claim for relief, albeit according to the rules as "defined by the Restatements." *Isaac v. Crichlow*, 63 V.I. 38, 58 (Super. Ct. 2015) (citing *Chase Manhattan Bank N.A. v. Power Products, Inc.*, 27 V.I. 126 (Terr. Ct. 1992)). The law has changed since then. Now, in the absence of statutory law and binding precedent, "the Superior Court must conduct a '*Banks* analysis' to determine the applicable common law." *Id.* (quoting *Banks v. Int'l Rental & Leasing Corp.*, 55 V.I. 967, 984 (V.I. 2011)). The reason why is two-fold. The "Superior Court of the Virgin Islands has 'concurrent authority' with the Supreme Court of the Virgin Islands 'to shape Virgin Islands common law.' " *Willie v. Amerada Hess Corp.*, 66 V.I. 23, 104(Super. Ct. 2017) (quoting *Gov't of the V.I. v. Connor*, 60 V.I. 597, 604 (V.I. 2014) (*per curiam*)). The common law governs in the Virgin Islands unless and until a statute supplants it. *See, e.g., id.* at 104 ("When statutes are silent, courts 'turn to the common law.' " (quoting *Smith v. Henley*, 65 V.I. 179, 191 (Super. Ct. 2016)); *see also Carlos Warehouse*, 64 V.I. at 183 ("When statutes are silent, the common law governs." (citations omitted)); *In re: Estate of Phillip*, 41 V.I. 37, 42 (Terr. Ct. 1999) ("Since the Virgin Islands Code is silent as to the required elements needed to create and continue a joint tenancy, the Territory shall observe the four unities standard as understood at common law."); *cf. Simon v. Joseph*, 59 V.I. 611, 623 (V.I. 2013) ("Since no statute sets forth the requirements for maintaining a legal malpractice action, and this Court has never issued a decision adjudicating a malpractice suit brought by a convicted criminal defendant, we must determine which common law rule to adopt.").

 This Court previously held that continuing to recognize conversion as a claim for relief is the soundest rule for the common law of the Virgin Islands. *See generally Isaac*, 63 V.I. at 59-60. As stated in *Isaac*, conversion is "an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." *Id.* at 59 (quotation marks and citation omitted). Further,

"conversion at common law does not require defendant's knowledge, intent, motive, mistake, or good faith," *Id.* at 61 (citation omitted). But a point that was not at issue in *Issac*, and that is raised here, is that "[n]either legal title nor absolute ownership of the property is necessary," but the party must still "allege it is *entitled to immediate possession at the time of conversion.*" *Farmers Ins. Exchange v. Zerin*, 53 Cal. App. 4th 445, 61 Cal. Rptr. 2d 707, 709 (1997) (quotation marks and citations omitted)).

██ ██ Chaput alleged that Patti stole a gun "from [his] home of record." (Compl. 1.) But at the hearing, he testified that the gun belonged to his wife. (*See* Hr'g Tr. 40:14-16 ("The gun was a licensed and registered possession of my wife.").) He further testified that his wife had passed away in 2009. *See id.* at 6:1-2 ("And my wife was an artist too. She passed away in '09."). At no time did Chaput allege, nor does the evidence show, that he was entitled to immediate possession of his deceased wife's gun around the time when Patti allegedly stole it from his house. Under Virgin Islands law, "[a] person having a bona fide residence or place of business within the Virgin Islands" may be licensed to carry a firearm in the Territory. 23 V.I.C. § 454(3). And while a firearm can be transferred "to another by sale, gift, exchange or otherwise," which presumably includes transfer by probate, the transfer has to occur after "*prior reporting* to the Commissioner of the details of the proposed transaction." *Id.* § 461(c) (emphasis added). Responsible gun owners, as part of their estate planning, could notify the Police Commissioner in advance of the person or person who will inherit their firearms after death. *Cf. Henderson v. United States*, 135 S. Ct. 1780, 1786, 191 L. Ed. 2d 874 (2015) (remarking in dicta that a gun owner could put his "guns in a secure trust for distribution to his children after his death."). But even if such details are reported to the Police Commissioner, the new owner would still have to re-register the firearm.

The United States Department of Justice promulgated new rules, effective June 13, 2016, concerning the possession and transfer of firearms registered to decedents. *See generally* 27 C.F.R. § 479.90a (2016). Now, to legally transfer a firearm registered to someone who has died, after death,

> [n]o later than the close of probate, the executor must submit an application to transfer the firearm to beneficiaries or other transferees in

accordance with this section. If the transfer is to a beneficiary, the executor shall file an ATF Form 5 (5320.5), Application for Tax Exempt Transfer and Registration of Firearm, to register a firearm to any beneficiary of an estate in accordance with § 479.90. The executor will identify the estate as the transferor, and will sign the form on behalf of the decedent, showing the executor's title (e.g., executor, administrator, personal representative, etc.) and the date of filing.

27 C.F.R. § 479.90(a).

■ The new rules were not made retroactive. *See* Machineguns, Destructive Devices and Certain Other Firearms; Background Checks for Responsible Persons of a Trust or Legal Entity With Respect To Making or Transferring a Firearm, Final Rule, 81 Fed. Reg. 2658, 2710 (Jan. 16, 2016) ("The final rule is not retroactive."). So, they do not apply to this case. But the new rules do make clear that when Chaput's wife passed away in 2009, he was not entitled to immediate possession of his wife's firearm just because he was her surviving spouse. "The new section *clarifies* that the executor, administrator, personal representative, or other person authorized under State law to dispose of property in an estate may possess a firearm registered to a decedent during the term of probate without such possession being treated as a 'transfer' under the NFA," or the National Firearms Act. *Id.* at 2659 (emphasis added).

■ The Magistrate Court erred by not determining what claim Chaput alleged and what law governed that claim. Chaput alleged a claim for conversion. But he failed to prove that claim because he did not show that he was entitled to possess his late wife's firearm when Patti allegedly stole it. "[T]he right to possess a gun" is not synonymous with "the right merely to sell or otherwise dispose of that item." *Henderson*, 135 S. Ct. at 1785. Both then and now, the executor of Chaput's wife's estate had to have transferred her firearm to Chaput and he then had to obtain a license to possess the gun. Unauthorized possession of a firearm is a crime in the Virgin Islands. *See* 14 V.I.C. § 2253. And a license to possess a firearm is good for only three years. *See* 23 V.I.C. § 455(b) ("The initial fee for a license under section 454 of this chapter shall be $75.00. The license may be renewed every three years for a fee of $150.00."); *see also id.* § 457(a)(3). Licenses are "not transferrable." *Id.* § 457(a)(2).

■ Notwithstanding the error in not applying the correct law, the Magistrate Court nonetheless reached the correct result. In rendering its

ruling, the court discounted Chaput's testimony. (*See* Hr'g Tr. 45:1-10 ("Also in Mr. Chaput's complaint, he indicates that Mrs. Scafidi stole a gun from his residence, which was legally licensed to his wife. . . . I find that testimony by Mr. Chaput unreliable."). Ordinarily, an appellate court cannot disturb the credibility determinations of the trial court. "It is well established that, on appeal, the court must defer to the credibility decision made by the factfinder, whether it be the judge or the jury." *Moore v. Walters*, 61 V.I. 502, 508 (V.I. 2014). But it is equally "well established that, under the 'right result, wrong reason' doctrine, where the record otherwise supports the trial court's judgment, an appellate court may affirm that judgment for reasons other than those relied upon by the trial court, even if the trial court's reasons are erroneous." *Antilles School, Inc. v. Lembach*, 64 V.I. 400, 438 n.23 (V.I. 2016) (citations omitted).

 Here, the result — that Chaput failed to prove conversion and that dismissal with prejudice was warranted — was correct. However, the dismissal should not have been by order, but by judgment. *See* SUPER. CT. R. 65 ("judgment shall be entered at the time of entry of findings by the judge."); *see also Julien v. Mims*, SX-12-SM-300, 2015 V.I. LEXIS 92, at *25 (Super. Ct. App. Div. Aug. 4, 2015) ("Once a party's claims are heard and considered on the merits — whether through a motion for summary judgment, a trial by jury or by the court, or a motion for directed verdict — a judgment must be entered."); *accord Johnstone v. Chapman Timber Co.*, 79 Ore. 674, 156 P. 286, 287 (1916) ("An action at law is disposed of either by a judgment in favor of plaintiff or defendant or one of nonsuit." (citations omitted)). *But see Goddard v. Sec. Title Ins. & Guar. Co.*, 83 P.2d 24, 28-29 (Cal. 1938) ("the trial court has no authority to add the term 'with prejudice' to a judgment *not on the merits*,"). Notwithstanding this technical error, and even though dismissal with prejudice was improper as to the first debt claim, dismissal with prejudice was the right result for the conversion claim because that claim failed as a matter of law. So, judgment as a matter of law should have been entered. *See, e.g., Roden v. Roden*, 29 Ariz. 549, 243 P. 413, 415 (1926) ("A judgment of dismissal 'with prejudice' is the same as a judgment for defendant upon the merits, and, of course, is *res judicata* as to every matter litigated." (citation omitted)). Because the dismissal must be reversed and remanded for entry of judgment in favor of Chaput on the first debt claim, the Magistrate Court will also be ordered to enter judgment against Chaput on the conversion claim.

## B. Consideration of Matters Not Admitted in Evidence

Chaput's second argument concerns the evidence that was before the Magistrate Court. In his brief, Chaput correctly states that "[t]he court hearing transcript and records will not show any evidence to support" the Magistrate Court's "comments [that the] Scafidis' always admitted they don't owe . . . any money." (Pet'r's Br. 10.) During the hearing, while responding to the court's questions regarding the discrepancies as to when the draft promissory note was signed, Chaput remarked, "[o]ne thing I can prove, I gave her the money. They received it. And they also admitted that they owed it." (Hr'g Tr. 32:17-19.) The court then contradicted Chaput's testimony, remarking that "[t]hey've always admitted that they don't owe you any money, unless you have something in writing where they say I owe . . . Mr. Chaput." *Id.* at 32:20-22, 24.

Hindsight is 20/20 and on review Chaput now questions how the Magistrate Court knew that the Scafidis denied owing him if they "procedural[ly] defaulted by not appearing." (Pet'r's Br. 11.) Chaput states that he "was never provided any copies of the evidence to support [the magistrate judge's] . . . comment on the Scafidis denying owing [him] money." *Id.* So, "[a]ny communications and or evidence from the DEFENDANTS to [the] Magistrate [Court] . . . should have been inadmissible and considered hearsay." *Id.* Once again, Chaput is correct.

Chaput sued Patti and Don. The Superior Court had subject-matter jurisdiction over Chaput's claims and had personal jurisdiction over Don and possibly Patti too.[18] Although neither of the defendants appeared for

---

[18] Although Patti told the Clerk's Office that she was not served, she did have notice of the lawsuit and actively participated in getting the trial dates continued. She also acknowledged — albeit by email to a court clerk — that she knew she had to appear and present forth a defense. (*See* Aug. 31, 2010 Mot. at 1 ("I myself was never served but according to my husband I have to come there too in order to defend myself. Why in the world he would be sued as well is beyond me. He never received a penny from Mr. Chaput.").) In general, actual notice of a law suit is not a substitute for proper service and absent proper service, a case must be dismissed for lack of personal jurisdiction over the defendant" *Ross v. Hodge*, 58 V.I. 292, 310 (V.I. 2013) (citing *Friedman v. Estate of Presser*, 929 F.2d 1151, 1155-56 (6th Cir. 1991)). "And the reason why is clear: 'Due process requires that the defendant be given adequate notice of the suit, and be subjected to the personal jurisdiction of the court. A judgment rendered in violation of due process is void.' " *Ernest v. Morris*, 64 V.I. 627, 640 (V.I. 2016) (quoting *Emps. Ret. Sys. of the Gov't of the V.I. v. Armstrong*, 23 V.I. 35, 37 (Super. Ct. 1987)). But Virgin Islands law also provides that "[a] voluntary appearance of the defendant shall be equivalent to personal service of the summons upon him." 5 V.I.C. § 115. Service on

trial, the Magistrate Court made Chaput present his case and then proceeded to raise counter-arguments on the defendants' behalf and accept those arguments as if they had been established. The Magistrate Court was correct that the Scafidis denied owing Chaput any money. But their denials came in *ex parte* communications with the Clerk's Office and the Magistrate Court. None of the documents that the defendants submitted, including the affidavit Don filed, were served on Chaput or provided to him by the Superior Court. This was not substantial justice.

 Judges cannot assume the role of advocate. *See Philip*, 66 V.I. at 622. They cannot "seek[ ] out the strongest arguments and most successful strategies for a party." *Id.* at 623 (quoting *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985)). In small claims cases, the court "must conduct the trial in such manner as to do substantial justice," keeping in mind that it is not "bound by rules of practice, procedure, pleadings, or evidence." *Julien*, 2015 V.I. LEXIS 92, at *21 n.2. But that does not give the small claims court license to "go[ ] beyond its position as neutral factfinder and tak[e] on the burden of proving (or disproving) a party's allegations." *Id.* at *22 n.2 (citing *Moore*, 61 V.I. at 508-09); *see also Moore*, 61 V.I. at 508-09 (affirming Appellate Division's holding that the small claims court does not have an obligation to obtain evidence and make a party's case for him). It is 'not only the right but the duty of the Superior Court judge to refuse to intentionally commit error.' " *Henry*, 2013 V.I. Supreme LEXIS 4, at *5 (quoting *Fontaine v. People*, 56 V.I. 571, 590 n.12 (V.I. 2012)). This duty is not any lower for Superior Court magistrate judges or for the Clerk of the Superior Court. To the extent that what occurred in this case — multiple communications *ex parte* and even non-party between court employees and the defendants and persons purporting to act on their behalf — is a practice, even an informal one, of the Clerk's Office or the Small Claims Division, this Court disapproves of

---

Patti is not before the Court. However, the Court does note that by her actions — multiple requests to have the trial continued and essentially seeking relief from the final order by having her name removed — she may have voluntarily appeared and thereby waived any defects in service. *Cf. Rivera-Moreno v. Gov't of the V.I.*, 61 V.I. 279, 299 n.7 (V.I. 2014) ("Because the Government fully participated in the proceedings below despite the purported defect in service, it has clearly waived any defects with respect to service of process." (citing 5 V.I.C. § 115)); *accord Thoenes v. Tatro*, 270 Ore. 775, 529 P.2d 912, 915 (1974) ("If the defendant appears and requests relief which can be granted *only* on the hypothesis that the court has jurisdiction, the appearance indisputably would be general and not special.").

it in the strongest most possible terms. *Accord Gov't of the V.I. v. Abiff*, Crim. No. 84-40, 1985 U.S. Dist. LEXIS 24239, at *3 (D.V.I. July 10, 1985) ("A further deviation begs mention. The trial judge, as it seems is his custom, almost completely took over the examination of witnesses. This relegated the assistant attorney general, the prosecutor, to the role of a virtual bystander. We cannot too strongly disapprove of this practice. Its continuance is strictly forbidden lest the Court become both prosecutor and judge."). " 'The law looks with disfavor on *ex parte* court action without notice, except where irreparable harm would result.' " *People v. St Omer*, 59 V.I. 89, 97 (Super. Ct. 2012) (quoting 60 C.J.S. *Motions and Orders* § 14 (2002)).

We would do a great disservice to Virgin Islanders and to the people who "turn[ ] to [our] courts for help to recover money owed from another," *Carlos Warehouse*, 64 V.I. at 192, if we were to allow parties private channels of communication with the Superior Court. We may as well "shut the doors of the courts of the Virgin Islands, especially the doors of the 'small man's court,' " *id.* (citation omitted), if we permit such practices to continue. Parties cannot be permitted to pepper the court *ex parte* with emails, letters, faxes, phone calls, and other forms of communication and court employees and officers accept the *ex parte* communications without at least informing the other side. Nonetheless, even "scholarly, well-intended judges err. . . . [W]hether with respect to substantive law, procedural issues, or abuses of discretion, judges make legal mistakes." *Antoine v. Hess Oil V.I. Corp.*, SX-05-CV-508, 2017 V.I. LEXIS 44, at *13 (Super. Ct. Mar. 10, 2017) (quotation marks and citations omitted). The same holds for employees of courts: even well-meaning court clerks and court employees make mistakes. *Accord Thomas v. United States*, 398 F.2d 531, 533 n.2 (5th Cir. 1967) ("Appellate counsel should be aware that court reporters and deputy clerks err occasionally, in Kipling's words, 'Even as you and I.' ").

Here the error is not harmless because, clearly, the Magistrate Court relied on the *ex parte* communications from the Scafidis. Otherwise, it could not have known that the Scafidis denied owing Chaput anything. The error would also provide an independent basis for reversing and remanding this matter for a new hearing. However, because the Court has already determined that the evidence was sufficient as to the $6,000 loan and that the debt claims against Patti and the conversion claim were

properly dismissed, reversing and remanding for a new hearing would serve no purpose here.

### C. Failure to Assist in Obtaining Evidence/Supplementing Record on Review

██ Next, insofar as Chaput argues on review that the Magistrate Court erred by not helping him obtain evidence or by not helping him present the evidence that he had in a more coherent fashion, that claim must be rejected. The person presiding over a Magistrate Division case is a judge, whether a Superior Court magistrate judge or a Superior Court judge sitting as a magistrate judge. *Cf. Brown v. Brown*, 59 V.I. 583, 587 (V.I. 2013) (*per curiam*). Both are judicial officers. *See* 4 V.I.C. § 72(c); *id.* § 122(d). They must be impartial. *See Phillip*, 66 V.I. at 622. They cannot help the parties to prove or disprove their claims and defenses. *See Moore*, 61 V.I. at 509. But "the Small Claims Division [must also] to do substantial justice between the parties." *Id.* at 508 (quotation marks and citation omitted). Consequently, the small claims court may use its discretion if appropriate to explain to the *pro se* litigants that they can subpoena witnesses and obtain evidence and continue the trial to a later date if necessary. *See id.* at 509 ("The trial court, within its discretion, could have provided Moore with directions on how to procure a copy of the transcript and then it could have interrupted the proceedings and continued the hearing for another date to allow Moore to produce a witness or a transcript that he failed to have with him as the case was tried, but the court chose not to do so.").

 Chaput did not ask the Magistrate Court for a continuance so that he could obtain additional evidence. He did not ask for leave to supplement the record. Yet, he knew enough to make that request on review in the Appellate Division. (*See* Feer's Mot. 1, filed Dec. 13, 2011 ("Motion [f]or the interest justice to bring attention of appellant [sic] division official police records, court records, and banking documented evidence judge failed to afford me the opportunity to present.").) The request cannot be granted, however, because "new evidence, different evidence, or more evidence cannot be submitted to the Appellate Division on review." *Carlos Warehouse*, 64 V.I. at 182 (citations omitted). Moreover, Chaput's position at trial and on review has been that he presented sufficient evidence. (*Cf.* Hr'g Tr. 37:23-38:1 ("Well, it's more than just a coincidence that we're talking about the $6,000 and that the

Scafidis are involved and they're mentioned. I can't imagine coming up with something like this.").) He is correct regarding the $6,000 debt claim, but not the remaining claims he asserted. Accordingly, since Chaput did not ask the Magistrate Court for leave to supplement the record or request a continuance to obtain additional evidence, the Court finds this error waived. *Cf. Gardiner*, 58 V.I. at 205 n.5. The motion Chaput filed on review must similarly be denied.

## IV. CONCLUSION

After careful consideration, the Court concludes that Chaput's internal appeal can proceed, even though he filed for bankruptcy because the complaint and appeal from the dismissal of the complaint were both filed by Chaput. Further, after considering the errors raised on review, the Court must affirm the Magistrate Court decision to dismiss the debt claims Chaput asserted against Patti as well as the conversion claim he asserted against her allegedly for stealing his late wife's gun. However, the court erred in dismissing one of the debt claims Chaput asserted against Patti and Don.[19] The Scafidis defaulted. By defaulting, they admitted to the allegations against them. Consequently, because debt is a

---

[19] Although not raised, and though any error is cured by reversal, the Court still notes a potentially "serious and flagrant" concern that could "go[ ] to the very integrity" of the Magistrate Division. *Madir v. Daniel*, 53 V.I. 623, 635 (V.I. 2010) (quoting *Fashauer v. N.J. Transit Rail Operations, Inc.*, 57 F.3d 1269, 1289 (3d Cir. 1995)). That concern is the Magistrate Court's decision to amend its dismissal order after Chaput had filed for review. Superior Court Rule 322.1(e) limits the authority of the magistrate court to take action in a case after a review has been filed. *See* SUPER. CT. R. 322.1(e) ("A magistrate whose order is being challenged on review *may not enter any subsequent order* in the case after a petition for review is filed." (emphasis added)). While the rule does provide some exceptions — issuing "a written opinion or order elucidating or memorializing an oral order," "setting an [a]ppeal [b]ond" or "resolving . . . [a] motion for reconsideration, if such order is entered within twenty (20) days," SUPER. CT. R. 322.1(e)(1)-(3) — "in all other circumstances," the magistrate court "has no jurisdiction to act on any matter in the case." SUPER. CT. R. 322.1(e)(5). The rule clearly imparts a "hands-off" approach to cases on review in the Appellate Division. It ensures that the Magistrate Division and the Appellate Division are not taking action in the same case at the same time. It underscores that the relationship between the Magistrate and Appellate Divisions mirrors the traditional hierarchy between trial courts and appellate courts since the Appellate Division serves as an intermediate appellate court between the Magistrate Division and the Supreme Court of the Virgin Islands, *Cf. Connor*, 60 V.I. at 604 ("Within every judicial system in the United States, including the Virgin Islands, courts are arranged in a pyramid, with trial courts at its base and a single court at the top with ultimate authority." (quotation marks, brackets, and citation omitted)); *see also Companion Assur. Co. v. Smith*, 66 V.I. 562, 570 (V.I. Supreme 2017) (trial court divested of

recognized claim, Chaput did not have to prove this claim. Nevertheless, the court still made Chaput present his evidence, but then ruled against him, finding that he had to corroborate his own evidence. That was in error and so was the decision to admit irrelevant evidence regarding an unsigned promissory note. The court then compounded these errors by basing its decision partly on the irrelevant evidence and on materials not admitted at trial. While the error might have required a new trial, on this record, the error is harmless because Chaput's evidence was sufficient as to his first debt claim and his remaining claims failed as a matter of law. Remanding for another hearing would serve no purpose here. Finally, Chaput's request to supplement the record is denied and his claim that the Magistrate Court should have allowed him to clarify the evidence is deemed waived. A separate order follows.

---

authority to rule on post-trial motions pursuant to appellate court's rules). To that end, Superior Court Rule 322.1(e) appears to be a divestiture rule as between the Magistrate and Appellate Divisions of the Superior Court *Cf. People v. San Nicolas*, 2016 Guam 21, ¶ 13 ("This concept is otherwise known as the 'divestiture rule,' which is a 'judge-made rule designed to avoid confusion or waste of time from having two courts considering the same issues at the same time.' " (quoting *Dumaliang v Silan*, 2000 Guam 24, ¶ 14)). Filing a review transfers authority over the case from the Magistrate Division to the Appellate Division. *See, e.g., Marrese v. Am. Academy of Orthopaedic Surgeons*, 470 U.S. 373, 379, 105 S. Ct. 1327, 84 L. Ed. 2d 274 (1985) ("In general, filing of a notice of appeal confers jurisdiction on the court of appeals and divests the district court of control over those aspects of the case involved in the appeal." (citation omitted)); *accord In re: Rogers*, 56 V.I. 325, 342 (2012) ("An effective notice of appeal of a final order typically divests the trial court of jurisdiction.") (brackets omitted) (citing *In re: Burke*, 50 V.I. 346, 351 n.1 (2008)). Because Chaput had filed for review, the Magistrate Court could not have exercised jurisdiction over this case unless it construed Patti's request as a motion for reconsideration. Again, the concern is moot because the dismissal order must be vacated. The Court still notes, however, that the Magistrate Court's amended order may have been void if it lost jurisdiction when Chaput petitioned for review. Out of an abundance of caution, both orders will be vacated.